SYNETICS, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

NCI Information Systems, Inc.,
Defendant–Intervenor.

No. 98–746C.

United States Court of Federal Claims.

Filed under seal Feb. 2, 1999.

Published with redactions Sept. 29, 1999.[1]

1. The opinion was issued under seal on February 2, 1999. The opinion has been redacted and is now published. Redacted portions are denoted by ellipses.

Donna Lee Yesner, Piper & Marbury, Washington, D.C., with whom on the brief were Larry D. Harris, Kevin P. Mullen, and Holly Emrick Svetz, for plaintiff.

Domenique Kirchner, Civil Division, U.S. Department of Justice, Washington, D.C., with whom on the brief were Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, and Frank W. Hunger, Assistant Attorney General, for defendant. Emily Sevald Bacon and Michael Walby, U.S. Army Tank–Automotive and Armaments Command, of counsel.

Kenneth D. Brody, McMahon, David & Brody, Vienna, Va., with whom on the brief was Matthew S. Simchak, Wiley, Rein & Fielding, Washington, D.C., for intervenor.

## OPINION

MARGOLIS, Judge.

This bid protest is before the Court on the parties' cross-motions for judgment on the Administrative Record, as supplemented by the parties, filed simultaneously on January 4, 1999. Plaintiff seeks injunctive and declaratory relief, requesting that the Court disqualify defendant-intervenor from the procurement, direct defendant to award the contract to plaintiff, and award fees and costs to plaintiff. In turn, defendant requests that the Court deny plaintiff's request for injunctive relief, and instead rule that defendant is entitled to judgment as a matter of law. Because defendant's award was an appropriate exercise of discretion, neither arbitrary nor capricious, and because plaintiff has failed to show prejudice, plaintiff's motion is denied, and defendant's motion is granted.

### FACTS

On May 4, 1998, the Tank–Automotive and Armaments Command ("TACOM" or "defendant") issued Request for Proposal Number DAAE07–98–R–Q217 (the "RFP" or "solicitation") for an information technology service

("ITS") contract at the Army base in Warren, Michigan. The solicitation specified a one-year base period of performance, with six one-year options. Synetics, Inc. ("plaintiff"), a supplier of computer network services to government and commercial customers, was the incumbent contractor on the predecessor ITS contract with TACOM for the network ("TWNET") and Help Desk components of the contract, as well as a portion of the Audio/Visual component. The TWNET portion of the work required the contractor to operate, maintain, and manage the TACOM computer network, including access to electronic mail, business automation services, and connectivity to other computers and networks. The Help Desk portion of the work required the contractor to staff and operate a central control point for responding to technical problems associated with the TWNET. Raytheon, Inc., was the incumbent contractor on the predecessor contract with TACOM for the final component, Administrative Services, as well as the remaining portion of the Audio/Visual component.

The RFP outlined the following three evaluation criteria: Technical, Past Performance, and Cost. The Technical Area was the most important of the three and was approximately equal in weight to the Past Performance and Cost Areas combined. The four elements to be evaluated in the Technical Area, in relative order of importance, included: (a) Experience; (b) Operation, Maintenance, and Support; (c) Staffing and Skills; and (d) Management Approach. Each evaluation element within the Technical Area was, in turn, comprised of four factors representing the four main components of the work: (i) TWNET; (ii) Help Desk; (iii) Audio/Visual; and (iv) Administrative Services.

The two elements to be evaluated in the Past Performance Area included: (a) Performance Risk; and (b) Small Business Participation. The Cost Area was to include an assessment by defendant of cost realism and reasonableness.

In advance of issuance of the RFP in May of 1998, NCI Information Systems, Inc. ("intervenor") recognized TACOM's procurement as a business opportunity, and it began to contact plaintiff's employees to determine whether they would be interested in working for intervenor should intervenor win the contract. For example, intervenor invited plaintiff's employees to an open house in March of 1998. Plaintiff was aware of the open house, but did not discourage or bar its employees from doing any of the following: attending; discussing their own personnel information, such as salaries, bonuses, positions, or qualifications; or discussing such personnel information regarding other Synetics employees. Plaintiff did, however, advise its employees not to divulge information about the way in which plaintiff did business, because of the information's significance in the upcoming competition. Intervenor then sent contingent offer letters to the eight Synetics employees who attended the open house, offering $250 in exchange for a commitment to work for intervenor should it win the contract. Three of plaintiff's employees accepted intervenor's contingent offer of employment. Five others evidenced an interest in coming to work for intervenor, should intervenor win the contract. In the course of recruiting plaintiff's employees, intervenor obtained information on current salaries, bonuses, positions, and background of various of plaintiff's employees.

Defendant held a pre-proposal site visit in Warren, Michigan, for interested offerors on May 19, 1998, and the proposal due date was set for June 24, 1998. Nine offerors timely submitted proposals, including plaintiff and intervenor. A competitive range determination was made by David Osburn, the Contracting Officer ("CO"), in accordance with Federal Acquisition Regulation ("FAR") 15.306(c), as a result of which, three proposals were determined to be the most highly rated, including intervenor's and plaintiff's proposals.

After the competitive range determination, defendant held discussions with the three offerors in the competitive range. At this point, and throughout the procurement, defendant expressed concern with the availability of staff to begin work at the time of award, and with the ability to retain employees in times of high employee turnover. Intervenor assuaged defendant's concern in part through its aggressive plan to hire

plaintiff's workforce, as its plan would "ensure seamless transition between the contractors." Administrative Record ("AR") at 2242. Plaintiff reassured defendant in part through its agreements for exclusive use of resumes, as well as bonus incentives promised to employees if they remained Synetics employees regardless of the outcome of the contract award.

On August 11, 1998, defendant asked intervenor, via Item for Discussion ("IFD") Number 46, to explain how it expected to reduce staffing levels without risking performance. Intervenor explained that its slightly reduced personnel levels in option years one and two was [. . .], AR at 2721, and referred to their own experience, to the Bruton Help Desk Staffing model, and to their "proactive support of the TACOM community" intended to eliminate some problems before they seriously affected TACOM users. AR at 2994–96.

During its discussions with plaintiff, defendant expressed concern with plaintiff's proposed staffing reductions in the option years as well. Plaintiff explained that, based on the announced 35% reduction in TACOM staff over the seven year period at issue, plaintiff had proposed commensurate reductions in its staff. In response, defendant informed plaintiff that "the lack of justification for reducing LAN System Administrators from three to one . . . represent[s] a significant weakness in your proposal. If not corrected, the result will be a lower rating for this portion of the technical area." AR at 6636. Plaintiff responded by eliminating the out-year staff reductions in its proposal, thereby increasing its cost.

Defendant called for Final Proposal Revisions ("FPRs") on September 4, 1998. All three offerors in the competitive range submitted their FPRs on September 8, 1998. Defendant awarded the contract to intervenor on September 16, 1998, and plaintiff's incumbent contract was extended to September 30, 1998, for transition.

On the day that defendant awarded the contract to intervenor, plaintiff terminated its deputy program manager for the incumbent TACOM contract, Gaillard Rembert. In the course of performing a routine scan of Rembert's e-mail files after he was terminat-

ed, plaintiff determined that Rembert had been communicating inappropriately with defendant throughout the proposal process concerning the availability of plaintiff's staff to perform the follow-on contract. In addition, plaintiff found that Kevin Hanley, the Novell Army account representative, had asked Rembert on August 27, 1998, to provide him with a list of Synetics personnel that intervenor might want to recruit, should it win the follow-on contract. Rembert sent a so-called "keepers list" to Hanley by e-mail the next day. The keepers list consisted of the names and positions of 28 Synetics employees and an opinion of each employee's work habits and general qualifications. Hanley, in turn, forwarded the keepers list to intervenor by e-mail on August 29, 1999. The keepers list was received and read by intervenor on August 31, 1998.

On September 22, 1998, plaintiff advised defendant that it possessed documentation indicating that the TACOM competition was marred by violations of the Procurement Integrity Act, 41 U.S.C. § 423. The CO reviewed the documentation and concluded on October 5, 1998, that the alleged misconduct had no impact on the procurement decision. On October 26, 1998, defendant referred the investigation of the Procurement Integrity Act violation to the U.S. Army Criminal Investigation Command ("CID"). After reviewing the documentation of the alleged violation and interviewing members of the Source Selection Evaluation Board ("SSEB") and two of plaintiff's employees, the CID concluded on December 2, 1998, that no violations of the Procurement Integrity Act had occurred.

This suit, seeking a temporary restraining order, a preliminary injunction, permanent injunctive relief, and declaratory relief, was filed on September 24, 1998. The Court denied plaintiff's motion for a temporary restraining order on October 6, 1998.

## DISCUSSION

Pursuant to 28 U.S.C. § 1491(b)(1)-(2) (Supp. II 1996), this Court may grant injunctive relief in bid protest cases where statutory violations involving procurement are al-

leged. However, as the Federal Circuit has articulated, the Court's equitable powers should be employed in a way that "best limits judicial interference in contract procurement." *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983). Thus, only where the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *Candle Corp. v. United States*, 40 Fed.Cl. 658, 663 (1998) (quoting 5 U.S.C. § 706(2)), may this Court grant injunctive relief. In determining whether this standard has been met, the Court looks to whether plaintiff has established that (1) the procurement lacked a rational or reasonable basis, or (2) the procurement involved a clear and prejudicial violation of applicable statutes and regulations. *See Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 782 (1991); *see also Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995). Because plaintiff has failed to establish either prong of the two-part test, its motion for judgment on the Administrative Record must be denied. Because defendant has demonstrated that its award to intervenor was well supported by the record, its cross-motion is granted.

## I. RATIONAL OR REASONABLE BASIS FOR PROCUREMENT

When deciding if the government acted with a rational or reasonable basis in making a particular contract award, the Court is mindful that "agencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.'" *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958–59 (Fed.Cir.1993) (quoting *Tidewater Mgmt. Servs., Inc. v. United States*, 216 Ct.Cl. 69, 83, 573 F.2d 65 (1978)); *see also United Int'l Investigative Servs., Inc. v. United States*, 42 Fed.Cl. 73, 80 (1998); *Wackenhut Int'l, Inc. v. United States*, 40 Fed.Cl. 93, 104–05 (1998). This discretion is especially broad in

negotiated procurements, such as the one involved in the present case. *See Delbert Wheeler Constr., Inc. v. United States*, 39 Fed.Cl. 239, 247 (1997), *aff'd*, 155 F.3d 566 (Fed.Cir.1998) (Table); *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 663, 671–72 (1997). As a result, the Court should not substitute its judgment for that of a procuring agency and should not upset an agency's contract award where it is founded on a rational basis. *See, e.g., Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995–96 (Fed.Cir.1996); *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *Delbert Wheeler Constr.*, 39 Fed.Cl. at 247. The burden of demonstrating the lack of a rational basis for an agency's award falls on the aggrieved offeror. *See Cincom*, 37 Fed.Cl. at 672 (citing *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983)); *Rockwell Int'l Corp. v. United States*, 4 Cl.Ct. 1, 3 (1983).

Plaintiff argues that defendant's award to intervenor lacked a reasonable or rational basis because defendant unfairly and improperly evaluated plaintiff's proposal as to all three major areas of the evaluation—Technical, Past Performance, and Cost.[2] Specifically, plaintiff contends that (A) the Technical evaluation was flawed because the evaluations of both the Experience and Management Approach elements within the Technical Area were not in accordance with the stated evaluation criteria in the RFP; (B) the Past Performance evaluation improperly considered quantity, rather than quality, of past contracts and failed to support a higher adjectival rating being awarded to intervenor; and (C) the Cost evaluation was flawed because it failed to include a meaningful cost realism analysis to account for varying levels of effort proposed by the offerors.

### A. Technical Evaluation

Plaintiff argues that the evaluation of its Technical proposal as "Good" was flawed

---

2. Defendant judged the parties as follows for the three major evaluation areas of the RFP:

| MAJOR AREA | INTERVENOR | PLAINTIFF |
|---|---|---|
| Technical | Excellent (Low Risk) | Good (Low Risk) |
| Past Performance | Excellent (Low Risk) | Good (Moderate Risk) |
| Cost (after most probable cost adjustment) | $31.48 million | $35.48 million |

AR at 676, 684, 685.

because defendant improperly rated plaintiff as "Good" rather than "Excellent" for the elements of Experience and Management Approach.[3]

### 1. Experience

Plaintiff contends that its rating of "Good" rather than "Excellent" for the Experience element stemmed from defendant's improper evaluation of plaintiff's Audio/Visual factor. According to plaintiff,

The SSA [Source Selection Authority] concluded Synetics had Excellent Experience for TWNET and the Help Desk, the most important [factors] of the Experience [element]. Synetics' experience was also considered excellent in the video and event planning portions of the audio/visual [factor]. Synetics' rating of "Adequate" with Moderate Risk in Audio/Visual Experience and its overall "Good" rating in Experience was based on the Source Selection Authority's conclusion that little previous experience was shown for the graphics portion of Audio/Visual and no previous experience was shown for photography, relatively minor aspects of the second least important [factor].

Second Amended Complaint ¶ 82. Plaintiff asserts that had defendant properly considered the experience of its subcontractors, plaintiff would have received the proper rating of "Good" for the Audio/Visual factor, and hence an overall rating of "Excellent" for Experience.

Plaintiff's argument is founded on several incorrect statements of fact. First, plaintiff was rated "Good" for Help Desk, not "Excellent." Thus, even assuming plaintiff is entitled to the rating of "Good" in Audio/Visual as it contends, plaintiff's overall Experience still would be comprised of one "Excellent" rating (TWNET), two "Good" ratings (Help Desk and Audio/Visual), and one "Adequate" rating (Administrative Services). On this basis alone, plaintiff's rating of "Good" overall for Experience would not be irrational or unreasonable.

Second, contrary to plaintiff's assertion, it is not true that plaintiff's "experience was also considered excellent in the video and event planning portions of the audio/visual" factor. In fact, the SSA does not assign adjectival ratings below the "factor" level. Rather, the SSA stated that plaintiff's experience in the video and event planning portions of the Audio/Visual work represented significant advantages, but noted offsetting weaknesses in the graphics and photography portions of the Audio/Visual work.

Finally, plaintiff contends that it cured the perceived weakness in experience for the graphics portion of the Audio/Visual factor by listing additional contracts on which its subcontractor, BPC, had graphics experience. Similarly, plaintiff contends that it addressed the perceived weakness in experience for the photography portion of the Audio/Visual factor by representing to defendant that it had "verbal confirmation that incumbent Raytheon photographers would accept employment with Synetics" if it was awarded the contract. Neither of these efforts entitled plaintiff to a rating of "Good" in Experience for the Audio/Visual factor. Although plaintiff did provide additional graphics experience possessed by BPC, such experience carried limited weight; the additional experience was not extensive, and BPC was slated to perform only slightly less than half of the Audio/Visual work on the contract. Similarly, plaintiff's representation that it had verbal commitments from incumbent photographers seems to be overstated. Instead, plaintiff had only verbal commitments from three incumbent employees, only one of whom was a photographer. Given

3. Defendant evaluated the parties as follows for the Technical Area:

| TECHNICAL ELEMENT | INTERVENOR | PLAINTIFF |
| --- | --- | --- |
| Experience | Excellent (Low Risk) | Good (Low Risk) |
| Operation, Maint., & Supp. | Excellent (Low Risk) | Excellent (Low Risk) |
| Staffing & Skills | Good (Low Risk) | Excellent (Low Risk) |
| Management Approach | Excellent (Low Risk) | Good (Low Risk) |
| TOTAL TECHNICAL SCORE | Excellent (Low Risk) | Good (Low Risk) |

AR at 676.

these considerations, the Court cannot say that defendant was irrational or unreasonable in finding that plaintiff warranted a rating of "Adequate" for Audio/Visual Experience. Plaintiff's rating of "Good" for the Experience element of the Technical Area was, therefore, appropriate.

### 2. Management Approach

Plaintiff also contends that the evaluation of its Technical proposal was improper because its rating of "Good" in Management Approach did not comport with the stated adjectival rating scale in the RFP. According to plaintiff, its rating of "Good" in Management Approach was not supported because it received five advantages and no disadvantages in this evaluation element. In support of its position, plaintiff points to Enclosure D of the Source Selection Evaluation Plan, which provides that proposals rated as "Excellent" include "numerous advantageous characteristics of substance, and essentially no disadvantages," and proposals rated as "Good" include "advantageous characteristics of substance, and few relatively minor disadvantages." AR at 567.

The rating of "Good" for plaintiff's Management Approach was consistent with the evaluation criteria set forth in the RFP. The rating given to an evaluation element, such as Management Approach, is a function of the underlying ratings given to its four component factors of TWNET, Help Desk, Audio/Visual, and Administrative Services. Plaintiff was rated as "Good" for each of these four factors underlying Management Approach. When the four factors comprising an evaluation element are all rated as "Good," the proper rating for that evaluation element clearly is "Good."

Moreover, assigning an adjectival rating to an evaluation factor or element is not a mechanical or quantitative process whereby the number of advantages and disadvantages are simply compared. Rather, "[m]erits shall be based on the feasibility, thoroughness, demonstrated capabilities, creativeness and overall soundness of the approach and supporting

documentation for each element." RFP § M.4.1 (AR at 186). Thus, where the quality, weight, and collective impact of the advantages and disadvantages are considered, it is possible that a proposal with several advantages and no disadvantages can, nonetheless, properly be rated as "Good." [4] Here, of the five advantages listed for plaintiff's Management Approach, four are qualified as "good" advantages, while only one is qualified as an "excellent" advantage. By contrast, intervenor's Management Approach received eight advantages, six of which were qualified as "excellent." Based on the difference in the quality and collective impact of the advantages of the offerors' Management Approach, the Court cannot find that defendant acted irrationally or unreasonably in rating plaintiff's Management Approach as "Good" and intervenor's Management Approach as "Excellent."

Plaintiff also argues that its Management Approach was improperly evaluated relative to intervenor's because defendant relied on unstated evaluation criteria in assessing the parties' plans for recruitment and personnel retention. According to plaintiff, defendant was concerned throughout the procurement process with intervenor's ability to recruit specific Synetics employees, should intervenor be awarded the contract. Plaintiff alleges that in late July or early August of 1998, Rembert provided defendant with the keepers list of Synetics employees. On August 30, 1998, Rembert allegedly advised defendant that a core group of the Synetics staff would leave Synetics, even if Synetics were awarded the follow-on contract. Similarly, Rembert allegedly advised defendant that a core group of Synetics staff would be willing to discuss employment with the new contractor. Defendant also was told by intervenor both that it possessed letters of intent from plaintiff's employees and that it would match bonuses promised by plaintiff. Plaintiff posits that defendant improperly considered this information when evaluating intervenor's Management Approach, which was rated "Excellent."

---

**4.** Indeed, it is quite telling that *intervenor's* proposal received *six* advantages and no disadvan-

tages for the Staffing and Skills element, yet was rated "Good," not "Excellent." *See* AR 711.

The Court disagrees with plaintiff that defendant's evaluation of the parties' Technical proposals was based on improper information. First, plaintiff has offered little evidence to support its claims that defendant received and relied on improper recruitment information in evaluating intervenor's proposal. Contrary to plaintiff's contention, defendant's evaluation of intervenor's Management Approach as "Excellent" was not dependent upon intervenor's ability to recruit specific Synetics employees. The Decision Memorandum lists myriad reasons supporting intervenor's rating of "Excellent" for Management Approach, most of which are unrelated to recruitment altogether. For instance, the Decision Memorandum explains that that intervenor's "Excellent" rating for Management Approach was based on intervenor's [...]. AR at 682. Although the Decision Memorandum also notes intervenor's comprehensive plan [...], such a plan, by definition, is not dependent on individual employees.

Similarly, plaintiff's proposal was not impacted by any information imparted to defendant by Rembert concerning a group of Synetics employees unwilling to stay employed by Synetics. The RFP required plaintiff to propose skill sets and additional job descriptions it would use if awarded the contract, as opposed to particular individuals. To ensure that the quality of the proposed skill sets did not decline after award, defendant also received assurances from plaintiff that any outgoing employees would be replaced with persons having qualifications equal to or better than the persons they replaced. Thus, the departure of any individuals from plaintiff's employ was indirectly addressed in the proposals and appropriately considered by defendant in that context. Moreover, the Court also notes that plaintiff was the only offeror to receive an "Excellent" rating for the Staffing and Skills element of the Technical Area, which considered the caliber and qualifications of proposed personnel and plans to attract and retain personnel.

The Court therefore finds that defendant did not act unreasonably or irrationally in rating plaintiff's Technical proposal as "Good," overall. Of the four evaluation elements comprising the Technical proposal, plaintiff received two "Good" ratings (Experience and Management Approach) and two "Excellent" ratings (Operation, Maintenance, and Support; and Staffing and Skills). Given that the four element level ratings are well supported by the SSA's Decision Memorandum, and that plaintiff received only a "Good" rating for the most important element of Experience, the Court finds that an overall rating of "Good" for the Technical proposal was well within the agency's discretion.

B. Past Performance Evaluation

■ Plaintiff next argues that defendant improperly rated the proposals in the Past Performance Area.[5] Plaintiff asserts that the Performance Risk element of its Past Performance should have been rated as "Excellent" rather than "Good," and that the Performance Risk of intervenor's Past Performance should have been rated as "Good" rather than "Excellent."[6] Plaintiff strikes a contrast between raw data collected in questionnaires on six of its prior contracts verses the raw data collected on six of intervenor's prior contracts, which plaintiff argues demonstrates the inequity of defendant's ratings: "Synetics' Excellent ratings in the applicable areas were: 87% for TWNET, 85% for Help

---

5. Defendant evaluated the parties as follows for the Past Performance Area:

| PAST PERFORMANCE ELEMENT | INTERVENOR | PLAINTIFF |
| --- | --- | --- |
| Performance Risk | Excellent (Low Risk) | Good (Moderate Risk) |
| Small Business Participation | Excellent (Low Risk) | Excellent (Low Risk) |
| TOTAL PAST PERFORMANCE RATING | Excellent (Low Risk) | Good (Moderate Risk) |

AR at 684.

6. Although plaintiff uses the phrase "Past Performance" throughout its discussion of this issue, it is apparent that plaintiff is referring not to the major area of Past Performance, but rather to Performance Risk, one of the two evaluation elements comprising the Past Performance Area.

Desk, 89% for A/V–Media, and 84% for Administrative Services.... NCI's Excellent ratings were: [...]." Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") at 35. Because Performance Risk was significantly more important than the other element comprising the Past Performance Area, Small Business Participation, plaintiff contends it would have been entitled to an overall rating of "Excellent" in the Past Performance Area had it received an "Excellent" on the Performance Risk element.

In rating the parties' Performance Risk, the SSEB did not treat information from all prior contracts with equal weight, however. Rather, the SSEB sought prior contracts with a high degree of predictive power:

> The number and quality of relevant contracts ... were considered the best indicator of an offeror's likely future ITS performance. In cases where highly relevant past performance was not reported by an offeror, we sought performance feedback on contracts having lesser relevance, but did not put the same weight on the responses received, since these responses provided input on performance less comparable to the scope of the [TACOM] acquisition.

AR at 3673. The data collected and considered by the SSEB for intervenor's Performance Risk derived from 32 prior contracts (including prior contracts held by intervenor's subcontractor, Signal Corp.). Of those prior contracts, at least 14 of the NCI contracts and all nine of the Signal Corp. contracts were deemed "highly relevant" to the present TACOM contract. Considering that intervenor received "Excellent" ratings more than any other single rating in its prior contract questionnaires with regard to the Help Desk, Audio/Visual, and Administrative components of contract performance, and that the SSEB also had the benefit of subjective comments apart from these objective scores, the Court cannot find that the SSEB acted irrationally or unreasonably in rating intervenor as "Excellent" for Performance Risk.

Nor can the Court find that the SSEB acted irrationally or unreasonably in coming to a different conclusion with regard to

plaintiff's Past Performance. Unlike the information collected from intervenor's prior contracts, less than half of the information collected from plaintiff's and its subcontractor's prior contracts concerned performance that was "highly relevant" to a portion of the TACOM contract. Of the prior contracts relied on, only five involved network contracts deemed highly relevant, and only two involved help desk contracts deemed highly relevant. Because the SSEB was *restricted* to data from fewer past contracts and those contracts were less relevant to the present TACOM contract, the SSEB concluded that plaintiff's proposal represented a moderate risk of unsuccessful performance. A rating of "Good" therefore had a reasonable basis in this situation.

The SSA agreed with the SSEB's evaluation of intervenor's Performance Risk, stating that,

> NCI's past performance includes a broad array of prior contracts which, in the aggregate, presents a history of highly relevant performance that allows for a strong prediction of successful performance on [the TACOM contract].... I find NCI's performance risk excellent, with low risk.

AR at 683. Although the SSA did not necessarily agree with the SSEB's rating of plaintiff's Performance Risk, he acknowledged that plaintiff's situation represented a close call. Commenting on the SSEB's determination, the SSA stated,

> I *equally could have concluded* (i) that [Synetics] was excellent, based on the relevance of their performance as the TWNET/Help Desk incumbent, plus the feedback on other related performance; and (ii) that even with questions in the A/V performance area, overall risk still could be assessed as low.

AR at 684 (emphasis added). The SSA went on to explain, however, that he "did not find any advantages in [Synetics's] past performance that render them superior to NCI on this element, and the Past Performance Area did not have a material effect on my selection decision." *Id.*

Plaintiff also argues that defendant failed to properly address instances of "Inade-

quate" past performance by intervenor's subcontractor, Signal Corp., as revealed on a past performance questionnaire. Plaintiff contends that the negative information was "set aside" by defendant, who inappropriately "decided to wipe the record clean."

The Administrative Record does not support plaintiff's characterization of defendant's treatment of the negative information, which was, in fact, given appropriate consideration by defendant. The Administrative Record reveals that intervenor provided a detailed and substantive response to defendant's concerns, which was duly considered by defendant. Intervenor proposed [ . . . ] to prevent the recurrence of similar problems. In addition, Signal Corp. instituted several changes itself, including a [ . . . ].

Although plaintiff may disagree with the SSEB and SSA ratings, it is well settled that "[m]ere disagreement with the . . . evaluation does not itself render the evaluation unreasonable." *Informatics Corp. v. United States,* 40 Fed.Cl. 508, 513 (1998) (citing *Litton Sys., Inc.,* B-237596.3, 90-2 CPD ¶ 115 at 8 (Aug. 8, 1990)); *see also UNICCO Gov't Servs., Inc.,* B-277658, 97-2 CPD ¶ 134 at 7, 8 (Nov. 7, 1997) (holding that protester's mere disagreement with the agency's evaluation of experience and past performance does not demonstrate that the agency's evaluation was unreasonable). Because the SSEB and SSA both found intervenor's proposal to be superior to plaintiff's for Performance Risk, and because Performance Risk did not constitute a material consideration in the SSA's award decision, the Court cannot find that the award to intervenor was irrational or unreasonable on the basis of Past Performance.

### C. Cost Evaluation

■ Plaintiff contends that the evaluation of the Cost proposals was flawed because defendant failed to conduct a meaningful cost realism analysis as required by the RFP. Specifically, plaintiff contends that defendant failed to properly consider the cost impact of (1) intervenor's and plaintiff's proposed reductions in staffing levels for contract out-years, (2) intervenor's use of five allegedly unpriced TWNET employees on the Help Desk portion of the contract work, and (3) intervenor's use of on-site TWNET and Help Desk personnel above the 19 person limit stated in the RFP. Plaintiff's FPR was approximately $4 million greater than intervenor's, even after defendant's downward adjustment of plaintiff's proposal lowered plaintiff's cost by $1.62 million.[7] Plaintiff asserts that had defendant properly evaluated plaintiff's and intervenor's Cost proposals, plaintiff's proposal would have been approximately [ . . . ] million less expensive, while intervenor's proposal would have been approximately [ . . . ] million more expensive. Thus, plaintiff concludes that the $4 million price differential should have been only [ . . . ], "not a significant difference."

### 1. Reductions in Staffing Levels

Plaintiff originally proposed reductions in staffing of approximately 20% over the course of the contract's life, including the six option years. Plaintiff contends that, in response to IFDs, it explained to the government that its proposed reductions were based on improvements in technology and automation, and on prospective reductions in TACOM staff of 35% over the next seven years.[8] Defendant, however, informed plain-

---

**7.** The parties' Cost proposals were evaluated as follows:

| | INTERVENOR | PLAINTIFF |
|---|---|---|
| Proposed Total Cost | $31.48 million | $37.09 million |
| Most Probable Cost Adjustment | None | $1.62 million downward |
| TOTAL EVALUATED COST | $31.48 million | $35.48 million |

AR at 685.

**8.** Although plaintiff posits that defendant failed to consider plaintiff's proposed technological improvements as a justification for its staffing reductions, the record belies that plaintiff emphasized this justification for the reductions at issue.

*See* AR at 6418 ("The reductions are based entirely on the publicly announced reshape of TACOM."); AR at 6621 ("The reductions are based entirely on the announced reshape of TACOM.").

tiff that "the lack of an explanation for how projected TACOM downsizing has been correlated to out-year staffing reductions, and that lack of justification for reducing LAN systems Administrators from three to one, together represent a significant weakness in your proposal. If not corrected, the result will be a lower rating for this portion of the technical area." AR at 6636. After further discussions did not persuade defendant that plaintiff's proposed staffing reductions were properly correlated to TACOM downsizing, plaintiff eliminated the staffing reductions from its proposal, raising the cost of its proposal by $2,042,755.

Intervenor, on the other hand, proposed similar out-year staffing reductions, which remained in its final proposal. Plaintiff contends that the different levels of effort proposed by the parties created an "apples to oranges" comparison, which defendant was required to equalize by creating a baseline of required effort and conducting a most probable cost analysis. Instead, defendant "merely accepted each offeror's technical approach, notwithstanding the different levels of effort proposed, and compared the proposed bottom-line cost of each." Plaintiff's Motion at 29. Plaintiff also alleges that defendant's discussions with the parties concerning the out-year staff reductions constituted misleading and improper discussions. Plaintiff asserts that "Synetics was . . . bullied into raising its offered price by eliminating staffing reductions in the out-years, while NCI was able to retain its similar reductions." Plaintiff's Motion at 26.

The Court disagrees with plaintiff that defendant was required to prepare a baseline to compare the reasonableness of the offerors' proposed man-hours. Because the RFP used a performance-based statement of work, rather than requiring specific technical approaches, each offeror was free to propose its own solutions to the various components of the statement of work. See, e.g., RFP §§ L.3.1, L.3.2 (AR at 167–68), M.4.1 (AR at 186). Without a consistent technical approach among the offerors, any particular baseline necessarily would be a poor indicator of the level of effort needed for all offer-

ors to successfully accomplish the work. Because plaintiff and intervenor proposed different technical approaches to the work, the use of a baseline to compare the level of effort proposed by each would not have been a fruitful exercise. Instead, the RFP required defendant to assess the extent to which an offeror's technical approach was feasible, and whether the offeror's level of effort was consistent with *its own* technical approach. RFP §§ L.5.1 (AR at 176), M.4.1 (AR at 186), M.4.1.3 (AR at 193). Nothing in the Administrative Record suggests that defendant did otherwise in this case.

The Court also disagrees with plaintiff that defendant's discussions with plaintiff concerning staffing reductions were improper or misleading in that they afforded plaintiff and intervenor disparate treatment concerning their respective proposed level of effort. Defendant afforded plaintiff several opportunities, through IFDs and face-to-face negotiations, to address defendant's concerns that a reduction in TACOM personnel would not translate into a lighter workload for plaintiff. Defendant explained to plaintiff that downsizing of the TACOM workforce in the past did not translate into a reduction of work for its contractors, and that many aspects of plaintiff's work would not be population dependent. Contrary to plaintiff's assertions, plaintiff was not instructed to remove the staffing reductions, but rather was asked to explain those reductions. Defendant, however, received no satisfactory explanation from plaintiff as to how TACOM downsizing justified the particular staffing reductions proposed by plaintiff. *See* AR at 6635–36. Instead, plaintiff voluntarily amended its proposal to remove the reductions in man-hours in the contract out-years. By amending its proposal, plaintiff likely avoided an upward cost adjustment and a weakness in its proposal that would have negatively affected its Technical evaluation. The Court fails to detect any coercion in this process.

In contrast, intervenor's proposed reductions in staffing were not based on future cut-backs by TACOM. Rather, intervenor

explained that its proposed reductions were based on an [...]. Intervenor told defendant that its [...], AR at 2721, and referred to their own experience, to the Bruton Help Desk Staffing model, and to their "proactive support of the TACOM community" intended to eliminate some problems before they seriously affected TACOM users. AR at 2994.

Although plaintiff attacks the accuracy of the Bruton model, intervenor pointed to the Bruton model simply to demonstrate that its approach "starts to bring the TACOM environment in line with *some known industry standards.*" AR at 2694 (emphasis added). Moreover, whereas the Bruton model proposed 40 calls per day for help desk personnel, intervenor's proposal projected only [...] calls per day. Because plaintiff and intervenor offered different rationales to support their respective reductions in out-year staffing, defendant's treatment of each was not required to be identical. The Court finds nothing to suggest that defendant's discussions were improper or misleading or that its Cost evaluations based on the proposed reductions were irrational.

### 2. Unpriced Work

Plaintiff next argues that, in response to a TACOM inquiry concerning staffing of the Help Desk, intervenor added five LAN technicians to its base year Help Desk staffing that were not otherwise priced in its proposal. According to plaintiff, had defendant properly considered the additional cost associated with these unpriced personnel when performing its most probable cost analysis, intervenor's most probable cost would have increased by [...].

Contrary to plaintiff's assertions, the Court finds that the cost of the five LAN technicians was, in fact, properly included in intervenor's proposal. Although intervenor proposed [...], and the cost of the LAN technicians was therefore included under that portion of the proposal. Deducting a

portion of [...] and adding it to the Help Desk portion of the contract, as plaintiff in effect proposes, would have no impact on intervenor's total proposed cost.

### 3. Excessive On–Site Personnel

Plaintiff next argues that intervenor was unfairly allowed to propose 21.5 on-site employees in the TWNET and Help Desk area, notwithstanding that the RFP limited on-site employees to 19. As a result, intervenor allegedly avoided an indirect cost from off-site overhead of [...]. Plaintiff asserts that intervenor's proposal should have received an upward cost adjustment to compensate for this unfair savings.

First, the Court notes that plaintiff has failed to support its contention that intervenor proposed 21.5 on-site employees for the TWNET and Help Desk areas.[9] The Administrative Record supports, as intervenor points out, that intervenor proposed [...] on-site personnel—[...] TWNET employees and [...] Help Desk employees. Thus, even if intervenor did propose personnel above the alleged 19 person limit in the RFP, it avoided off-site overhead for only [...] employee and any cost advantage was *de minimis* in light of the overall costs of the proposals.

Second, it does not appear that proposing [...] employees for the TWNET and Help Desk areas did, in fact, violate the RFP. In June of 1998, defendant issued a written response to a question received after the pre-proposal site visit, which informed all offerors that the incumbent contractor (Synetics) had 21 on-site personnel for the TWNET and Help Desk functions. Nineteen of those 21 employees were located in the larger room that served the Network Monitoring Center and Help Desk, while the remaining two employees were located at two work stations near the larger room. Although Amendment 1 to the RFP stated that the Network Monitoring Center and Help Desk could accom-

9. Neither plaintiff's Second Amended Complaint nor plaintiff's Proposed Findings of Fact specifies from where plaintiff gets the 21.5 employees or [...] figures cited. Moreover, plaintiff fails to mention the [...] cost adjustment in either its Motion for Summary Judgment or its Reply in Opposition to Defendant's Motion for Summary Judgment. Instead, plaintiff argues only an [...] savings to intervenor for a single employee allegedly permitted on-site in contravention of the 19 employee limit. This position is consistent with intervenor's contention that it proposed [...] on-site employees for the Help Desk and TWNET areas.

modate 19 on-site employees, it did not preclude offerors from also continuing to use the two work stations located near the larger room to house two additional employees. If plaintiff found Amendment 1 of the RFP unclear or ambiguous in this respect, it should have raised the issue prior to submitting its bid. *See Johnson Controls, Inc. v. United States*, 229 Ct.Cl. 445, 458–60, 671 F.2d 1312 (1982); *James A. Mann, Inc. v. United States*, 210 Ct.Cl. 104, 122–23, 535 F.2d 51 (1976).

### D. Cumulative Effects of Alleged Evaluation Errors

Plaintiff's allegations that defendant improperly evaluated all three major areas of plaintiff's proposal do not establish that defendant's award to intervenor was arbitrary or capricious. Even assuming that plaintiff's proposal should have been rated "Excellent" for Management Approach within the Technical Area, should have been rated "Excellent" overall in the Past Performance Area, and should have been deemed close in cost to intervenor's proposal due to price adjustments, all as plaintiff contends, defendant would still have had a rational or reasonable basis for awarding the contract to intervenor.

Assuming these contentions, both intervenor and plaintiff would have received three "Excellent" ratings and one "Good" rating for the Technical proposal. However, intervenor's "Excellent" rating in the most important evaluation element, Experience, renders its proposal superior to plaintiff's in the Technical Area, the most important of the three major areas. Thus, based on a superior Technical evaluation, defendant possessed a rational basis for awarding the contract to intervenor. This finding is particularly true in light of the fact that the cost of plaintiff's proposal remains [ ... ] higher than intervenor's, even once plaintiff's allegations of flawed price evaluations are assumed to be meritorious. Therefore, plaintiff has not established that defendant acted irrationally or unreasonably by awarding the contract to intervenor. *See Finley v. United States*, 31 Fed.Cl. 704, 706 (holding that, in similar circumstances, agency's emphasis on factors explicitly publicized as most important provided

rational basis for award); *cf. United Int'l Investigative Svcs., Inc. v. United States*, 41 Fed.Cl. 312, 323 (1998) (granting relief in bid protest because plaintiff had a higher technical score and a lower evaluated cost).

## II. *NO VIOLATION OF STATUTES OR REGULATIONS*

In addition to the alleged improper evaluation of the parties' proposals discussed above, plaintiff alleges at least three additional statutory or regulatory violations in the procurement process: (1) intervenor and defendant violated the Procurement Integrity Act by receiving "contractor bid or proposal information"; (2) intervenor made, and defendant relied upon, a material misrepresentation of fact; and (3) defendant violated FAR 15.306 by engaging in unequal discussions with intervenor and plaintiff. Failing success on those points, plaintiff contends that the mere appearance of impropriety in this procurement compromised the integrity of the procurement process, and that the contract award to intervenor therefore should be invalidated.

"[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996); *Candle Corp.*, 40 Fed.Cl. at 663. To establish prejudice in a post-award protest, the protester must show that, but for the agency's violation, a reasonable likelihood exists that the protester would have been awarded the contract. *See Data Gen. Corp.*, 78 F.3d at 1562; *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996); *Candle Corp.*, 40 Fed.Cl. at 665.

### A. Alleged Violations of Procurement Integrity Act

Because plaintiff has failed to establish that defendant or intervenor violated the Procurement Integrity Act, plaintiff's first allegation fails. Further, even assuming that plaintiff demonstrated a clear violation of the Procurement Integrity Act, plaintiff has failed to show prejudice, as plaintiff did not establish that there was a reasonable likelihood that it would have been awarded the

contract but for any such violation. *See Data Gen. Corp.*, 78 F.3d at 1562 (requiring plaintiff to show that, but for improper communications between awardee and government, plaintiff had a reasonable likelihood of being awarded the contract).

■ Plaintiff contends that Rembert and Novell's Army account representative, Kevin Hanley, facilitated intervenor's and defendant's receipt of plaintiff's personnel information, such as the keepers list and bonus and compensation data. First, the alleged actions were not violations of the Procurement Integrity Act at all.[10] Instead, the alleged violations involve information that does not meet the definition of "contractor bid or proposal information" as defined by FAR 3.104–3, as plaintiff's personnel and bonus information was not any of the following: cost or pricing data; indirect costs and direct labor rates; proprietary information about manufacturing; information marked by the contractor as "contractor bid or proposal information"; or information marked in accordance with 52.215–1(e).

Moreover, the personnel information contained in the keepers list appears to have been generally available. For example, at least five months before receiving the keepers list, intervenor held a job fair, to which plaintiff's employees were invited.[11] Intervenor had to have had the names of plaintiff's employees or, at a minimum, some other contact information, in order to have issued invitations to the job fair. As a result of the job fair, and still months before receipt of the keepers list, intervenor extended contingent offers to several of plaintiff's employees whose names were later listed on the keepers

list.[12] Further, two employees on the keepers list had accepted intervenor's offer before intervenor's receipt of the keepers list and, in fact, before creation of the list.[13] In sum, the keepers list simply contained information that was generally available. Plaintiff has not established that defendant or intervenor violated the Procurement Integrity Act, as the keepers list did not contain procurement sensitive information.

The bonus information, while not necessarily generally available, neither was procurement sensitive information nor illegally obtained. At the March 1998 job fair, many of plaintiff's employees volunteered compensation information. Although plaintiff's employees were contractually bound not "to interfere with the Company's relationship with its other employees," Plaintiff's Proposed Findings of Fact at Tab 6, page 2, (interpreted as: (i) inducing or attempting to induce any employee to quit; (ii) interfering with or disrupting plaintiff's relationship with its employees; or (iii) soliciting, enticing, or hiring away any employee), intervenor was not so bound. Further, plaintiff's employees were *not* bound to silence with regard to their compensation packages and those of their fellow employees. The incentive bonus agreement, signed by 10 key employees, did not mention any prohibition of disclosure of the bonus structure. Because such information was not procurement sensitive,[14] and plaintiff's confidentiality agreement did not prohibit its disclosure, intervenor's compilation of plaintiff's compensation information did not rise to the level of a violation of the Procurement Integrity Act. Intervenor did not encourage plaintiff's employees to lure any of plaintiff's other em-

---

10. In addition to the Court's finding that no Procurement Integrity Act violation occurred, the Criminal Investigation Command independently determined that no such violation took place.

11. Plaintiff knew about the job fair and did not discourage its employees from attending, as is evidenced by plaintiff's senior manager Tim Haugan's e-mail to personnel regarding the upcoming job fair.

12. Intervenor extended contingent offers to eight of plaintiff's employees on June 7, 1998. Six of these were included on the keepers list, received by intervenor almost three months later.

13. Two of the three employees who accepted their contingent offers were mentioned as approachable on the keepers list (created in August), yet they had already accepted their contingent offers on June 18 and 19, 1998, respectively.

14. *See, e.g., Textron Marine Sys.*, B–255580.3, 94–2 CPD ¶ 63 (1994) (finding that compilation of names, positions, and experience of incumbent contractor's employees was not proprietary information); *RAMCOR Servs. Group, Inc.*, B–253714, 93–2 CPD ¶ 213 (1993) (finding that list of names and telephone numbers of incumbent's employees was not proprietary information).

ployees away from plaintiff. Rather, intervenor only requested information regarding remuneration paid to plaintiff's employees. Nor did plaintiff's employees' disclosure of such information "interfere with" the relationship between plaintiff and its employees, as defined in the confidentiality agreement. Thus, plaintiff has not established that intervenor violated the Procurement Integrity Act by gathering plaintiff's bonus and compensation information.

Further, even assuming arguendo that the alleged conduct constituted a violation of the Procurement Integrity Act, plaintiff has failed to show prejudice, as there has been no showing that plaintiff likely would have been awarded the contract in the absence of any such violation. First, it is not clear that either intervenor or defendant took into account plaintiff's personnel information, much less used it to influence the proposal process. For instance, intervenor received the keepers list on August 29, 1998, just days before it submitted its FPR on September 8, 1998. In those few days between receipt of the keepers list and submission of its FPR, intervenor did not modify its proposal in any areas relating to personnel.

Second, as both plaintiff and defendant point out, the solicitation did not require offerors to submit specific personnel information, and even if such information were unofficially considered, the Court is not persuaded that defendant relied on that information in making its award. Consequently, receipt of such information could not have constituted an advantage to intervenor, nor a disadvantage to plaintiff, thus plaintiff has not established that, but for intervenor's or defendant's receipt of such information, plaintiff had a reasonable likelihood of winning the contract.

In sum, plaintiff has not established that any violations of the Procurement Integrity Act occurred. Further, because plaintiff has not shown that, absent any such violations, it likely would have been awarded the contract, plaintiff has not demonstrated prejudice. Consequently, the Court is not convinced that plaintiff's first allegation merits judgment in favor of plaintiff.

**B. Alleged Material Misrepresentation**

■ Next, plaintiff claims that intervenor made a material misrepresentation to defendant by asserting that intervenor had eight signed letters of intent from then-employees of plaintiff. Although a miscommunication most certainly occurred, plaintiff has not demonstrated that the communication was, in fact, made by intervenor, or even if it was, that the statement was intentionally misleading. Further, plaintiff establishes neither that the alleged misrepresentation was material to defendant's contract award, nor that defendant relied on intervenor's alleged misrepresentation.

While intervenor concedes that it did not in fact possess eight signed letters of intent, but rather three signed letters and five communications of interest, intervenor does not admit that it made the misstatement in the first place, and even if it did, on these facts such a misstatement did not necessarily constitute actionable misrepresentation. On August 25, 1998, CO David Osburn memorialized discussions between TACOM personnel and intervenor regarding intervenor's efforts to acquire Synetics employees in the event that intervenor were to win the contract. Mr. Osburn wrote, "As of 25 August, NCI has signed letters of intent from eight current Synetics employees, plus cautious expressions of interest from at least five others." AR at 2827.

According to intervenor, the CO's memorialization simply misstates the facts of the communication; intervenor in fact had in hand only three signed letters of intent, and five expressions of interest, for a *total* of eight interested then-Synetics employees. Intervenor suggests, and the Court agrees, that "[t]he similarity between the numbers recorded by TACOM at the end of the August 25 conversation (*eight* signed letters received, *five* expressions of interest) and the actual numbers reflected in the record (*eight* total letters, *five* expressions of interest)," Intervenor's Reply at 16–17 (emphasis in original), is much more likely to indicate a miscommunication, perhaps between NCI and TACOM or among NCI employees, or even a misunderstanding and thus mismemorialization by the CO himself. Such a mis-

take in communication does not constitute intentional misrepresentation.

Instead, intentional misrepresentation occurs when a party makes a "false statement of a substantive fact ... [that] leads to a belief of a substantive fact material to proper understanding of the matter in hand, *made with intent to deceive or mislead.*" BLACK'S LAW DICTIONARY 1001 (6th ed.1990) (emphasis added); *see also Aerospace Design & Fabrication, Inc.,* B–278896.2, 98–1 CPD ¶ 139 (May 4, 1998) (finding misrepresentation where offeror stated in its proposal that it had received commitments to work from three specific individuals, two of whom had not given permission to use their names in the proposal, the third of whom had specifically forbidden offeror from using his name); *Informatics, Inc.,* B–188566, 78–1 CPD ¶ 53 (Jan. 20, 1978) (finding misrepresentation where offeror informed agency that telephone survey of 60 incumbent personnel revealed that 80% would remain on the contract if the offeror won, many of whom stated that offeror never contacted them prior to award); *ManTech Advanced Sys. Int'l, Inc.,* B–255719.2, 94–1 CPD ¶ 326 (May 11, 1994) (finding misrepresentation where offeror claimed to have commitments from various incumbent personnel, several of whom had expressly forbidden offeror from using their names in its proposal); *Matter of CBIS Fed. Inc.,* 71 Comp.Gen. 319 (Mar. 27, 1992) (finding misrepresentation where offeror proposed specific personnel it knew were not available); *Ultra Technology Corp.,* B–230309.6, 89–1 CPD ¶ 42 (Jan. 18, 1989) (finding misrepresentation where offeror proposed specific individuals who had never granted permission to be included in the proposal). Plaintiff simply has not established the intent necessary to demonstrate misrepresentation.

Additionally, even assuming the misrepresentation occurred as plaintiff alleged, plaintiff has not shown that any such misrepresentation was material to defendant's procurement award to intervenor. The RFP did not call for specific employee information. Moreover, the CO specifically testified in deposition that "[w]hether [NCI] had [contingent offer letters] or not was, to

a degree, irrelevant." Osburn Deposition at 102. Further, defendant's evaluation of intervenor gave no consideration to intervenor's statement regarding its enlistment of then-Synetics employees. Rather, the Decision Memorandum demonstrates that intervenor's "Excellent" rating for Management Approach (an evaluation element of the Technical proposal) was based in part on "its detailed plan for daily management to ensure continuous network operation," a comprehensive plan for attracting and retaining employee skill sets, "complete plans for controlling purchases and managing equipment inventories," "an excellent transition plan ... to include extra staffing at the outset of performance," and "recurring management reports to the Government." AR at 682. Thus, even assuming an intentional misrepresentation occurred, plaintiff cannot demonstrate that the alleged misrepresentation was material, as there is no evidence that defendant relied on it in its evaluation of intervenor's proposal. Absent a material misrepresentation, plaintiff cannot establish prejudice. As a result, plaintiff's second allegation fails.

### C. Alleged Improper Discussions

Plaintiff next alleges that defendant engaged in leveling or coaching, thereby conducting in improper discussions with intervenor in violation of FAR 15.306, by communicating the following information to intervenor: "If you are willing to amend your proposal to specify that only your level 2 Help Desk personnel will have access, this feature of your proposal will be counted as an advantage." *See* AR at 2736. Because the FAR encourages COs to discuss areas of an offeror's proposal that might be enhanced "to maximize the Government's ability to obtain best value," 48 C.F.R. § 15.306(d)(2), plaintiff fails to establish that defendant engaged in improper discussions with intervenor.

■ Technically, plaintiff is incorrect in its assertion that the FAR prohibits leveling. Although prior to October 10, 1997, the FAR did prohibit leveling, *see* 48 C.F.R. §§ 15.610(d), (e)(2)(ii) (1996), the FAR now "merely prohibits favoring one offeror over

another in the conduct of discussions." THE GOVERNMENT CONTRACTS REFERENCE BOOK 509–10 (2d ed.1998) (citing 48 C.F.R. § 15.306(e)(1)). Regardless, plaintiff fails to demonstrate that defendant's communication above constitutes leveling *or* unequal treatment.

Technical leveling was defined as "helping an offeror to bring its proposal up to the level of other proposals through successive rounds of discussion, such as by pointing out weaknesses resulting from the offeror's lack of diligence, competence, or inventiveness in preparing the proposal." 48 C.F.R. § 15.610(d)(1); *see also Drexel Heritage Furnishings v. United States*, 7 Cl.Ct. 134, 153 n. 19 (1984) ("Technical leveling is the disclosure of 'one proposer's innovative or ingenuous solution to a problem....'") (quoting B–173677, 51 Comp. Gen. 621, 622 (1972)), *aff'd*, 809 F.2d 790 (Fed.Cir.1986) (Table); *Rockwell Int'l Corp.*, 4 Cl.Ct. at 3 (defining leveling as "providing one offeror with information as to specific desired items or approaches to the detriment of another offeror *who may have initially proposed such an item or an innovative and desirable approach*") (emphasis added). Plaintiff does not assert that defendant communicated plaintiff's innovative solution to intervenor. Rather, plaintiff merely asserts that defendant communicated with intervenor about a weakness of intervenor's that could become a strength.

▬ Furthermore, although plaintiff complains that it was treated unequally in light of defendant's communication to intervenor discussed above, plaintiff too was informed of an area that defendant viewed as one for potential improvement or, in the least, explanation. When questioned about its proposed out-year staff reduction, plaintiff, in contrast to intervenor,[15] did not adequately explain why it correlated future TACOM staff reductions with an ability to reduce staffing on the contract. Instead, plaintiff amended its proposal to delete proposed staff reductions, thereby avoiding a perceived weakness in its proposal. Thus, plaintiff benefitted from the

same type of discussion that it complains of with regard to intervenor.

Finally, while the FAR prohibits unequal treatment, it also provides:

> The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.... The contracting officer shall ... indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price, technical approach, past performance, and terms and conditions) that could, in the opinion of the contracting officer, be altered or explained to *enhance materially the proposal's potential for award. The scope and extent of discussions are a matter of contracting officer judgment.*

48 C.F.R. § 15.306(d)(2), (3) (emphasis added).

It is clear that the FAR encourages COs to use their judgment to discuss matters with offerors in order to "enhance materially the proposal's potential for award." 48 C.F.R. § 15.306(d)(3). In light of the regulation's clear direction to COs, Osburn's communication to intervenor cannot be construed as either leveling or unequal treatment, but rather constitutes informing the offeror of aspects of intervenor's proposal that could "be altered or explained to enhance materially the proposal's potential for award." *Id.*

In sum, plaintiff cannot establish that defendant's discussions regarding perceived weaknesses in intervenor's proposal were improper. Neither did defendant engage in leveling by communicating plaintiff's solutions to intervenor, nor did defendant unequally encourage intervenor and plaintiff to alter or explain perceived weaknesses in their respective proposals. Consequently, plaintiff's allegation regarding improper discussion fails.

---

**15.** As discussed above, intervenor explained that its reduced personnel levels in the option years

were based on considerations other than TACOM's staff reductions.

### D. Mere Appearance of Impropriety

 Failing the three alleged statutory/regulatory violations discussed above, plaintiff contends that the mere appearance of impropriety in this case warrants judicial recision of defendant's contract award and granting of the contract to plaintiff. Because plaintiff's contention is contrary to established precedent that the Court should not substitute its judgment for that of a procuring agency, upsetting a contract award only when it is clear that the agency's determinations were irrational or unreasonable, *e.g.*, *Baird*, 1 Cl.Ct. at 664, and that a bid protester *must* establish prejudice, *e.g.*, *Data Gen. Corp.*, 78 F.3d at 1562, plaintiff's argument fails.[16]

Plaintiff cites to *Compliance Corp. v. United States*, 22 Cl.Ct. 193, *aff'd*, 960 F.2d 157 (Fed.Cir.1992) (Table), to support its contention that the mere appearance of impropriety in the process warrants recision. Yet the posture of *Compliance Corp.* was quite different than that of the instant dispute, and plaintiff has confused the two prongs of the two-part test outlined in *Logicon:* injunctive relief may be granted where plaintiff establishes either that (1) the procurement lacked a rational or reasonable basis, or (2) the procurement involved a clear and prejudicial violation of applicable statutes and regulations. *Logicon*, 22 Cl.Ct. at 782.

In *Compliance Corp.*, the Court did not determine that the mere appearance of impropriety warranted disqualification; rather, the CO made that determination. *Compliance Corp.*, 22 Cl.Ct. at 196–97. The General Accounting Office, and later the Court, accorded due deference to the CO's decision, refusing to upset the CO's determination absent a finding that it was arbitrary or capricious. The Court, then, in affirming the CO's final decision deciding against the awardee whose contract was rescinded for the appearance of impropriety, was applying the first part of the two-part standard by simply deferring to the CO's judgment, and refusing to substitute its judgment for that of the agency's where the CO's decision was not arbitrary or capricious.

In contrast, plaintiff asks this Court to reject the CO's conclusion, and thereby determine that the mere appearance of impropriety harmed the procurement process. However, absent circumstances similar to those in *Compliance Corp.*, the Court must conform to established precedent: the plaintiff must demonstrate either that the CO's decision was arbitrary or capricious, or that the plaintiff was prejudiced by a clear violation of a statute or regulation. *See Logicon Inc.*, 22 Cl.Ct. at 782. Consequently the Court, absent a prejudicial statutory violation or an arbitrary decision by a CO, cannot rescind the contract based on the mere appearance of impropriety.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the Administrative Record is **DENIED;** defendant's cross-motion for judgment on the Administrative Record is **GRANTED.** The Court will publish this opinion 30 days from the date of filing of this opinion. The parties should notify the Court within that time as to what parts should be redacted. The Clerk will enter judgment for the defendant. No costs.

---

16. *See also, e.g.*, 28 U.S.C. § 1491(b)(4) (stating that review of agency decisions shall proceed according to 5 U.S.C. § 706); 5 U.S.C. § 706(2)(A) (stating that agency actions are to be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Central Arkansas*, 68 F.3d at 1342 ("[O]nly a 'clear and prejudicial violation' of a procurement statute or regulation warrants relief." (citations omitted)); *Candle Corp.*, 40 Fed. Cl. at 665.

* This order was originally filed under seal on May 13, 1999. It directed the parties to file a joint status report indicating whether this order could be released for public dissemination in whole or with proposed redactions. Defendant filed a report on May 19, 1999, indicating that it believes the order can be released without redaction. Plaintiff filed its status report on June 3, 1999, but did not indicate any opposition to releasing the order in whole. Accordingly, the order is released for publication without redaction.

could be implied from dealings between the parties, open-ended indemnity for third-party liability would violate the Anti–Deficiency Act. 31 U.S.C.A. § 1341.