**CANDLE CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Boole & Babbage, Inc., Intervenor–Defendant.**

**No. 97–851C.**

United States Court of Federal Claims.

April 3, 1998.

---

William F. Savarino, Washington, DC, for plaintiff.

Mark L. Josephs, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Captain Andrew Fechhelm, Assistant General Counsel, Defense Logistics Agency, of counsel.

John R. Tolle, McLean, VA, for Intervenor–Defendant Boole & Babbage, Inc.

## OPINION

MEROW, Judge.

[This Opinion was filed, under seal, on February 27, 1998, and it was then provided that, by April 1, 1998, counsel would file redacted versions to identify any confidential, proprietary business information which should not be disclosed to the public. The redacted versions have been filed under seal, and, as a result, several brief modifications have been made in the following Opinion to remove the confidential, proprietary business information which was identified. Several other minor changes have been made as well. The February 27, 1998 Opinion remains under seal as the basis for the final judgment entered in this case.]

This post-award bid protest is before the court on cross-motions for judgment on the administrative record. Plaintiff Candle Corporation ("Candle") seeks to set aside the United States Department of the Army, Defense Communications Electronics Evaluation and Testing Activity's ("DCEETA") decision to award a software contract to defendant-intervenor Boole & Babbage, Inc. ("Boole"). Plaintiff maintains that the award was improper because Boole's proposal did not comply with "minimum essential requirements" in the solicitation. For the reasons stated below, it is determined that the award was not in accordance with law. However, because plaintiff has not shown that it was prejudiced, it is not entitled to relief.

## BACKGROUND

The procurement at issue involves MQSeries system management software. MQSeries is messaging software developed by IBM which allows business applications to integrate and communicate across desktop and mainframe systems, overcoming inconsistencies with different network protocols and all major commercial platforms. While security considerations preclude a description of DCEETA's MQSeries system, the materials in the administrative record provide an example of how the software can be used. A state agency could use MQSeries to process the renewal of driver's licenses. As a customer waits at a local department of motor vehicles office, a clerk sends a message by computer to state headquarters requesting approval of renewal of the customer's license. The message enters a centralized queue and is posted in individual queues for review by different applications. Each application performs a different function, such as research for outstanding tickets, arrest warrants, etc. If the customer's record is clean, each application will send an "okay" and approval will be provided to the local clerk. Administrative Record ("AR") at 108.

On September 15, 1997, DCEETA sent a request for information ("RFI") to four software companies, Boole, Candle, Tivoli Systems ("Tivoli"), and BMC Software, Inc. ("BMC"), seeking information about products which would allow DCEETA to manage and monitor its MQSeries system. One question asked was, "Does the system provide the functionality to edit the contents of an individual message [in a queue]?" AR at 20. The use of queues in messaging is described in a source referenced in the record as follows:

> Queuing is a NO–CONNECTION communication choice. Queuing partners are not directly connected; they communicate only through queues.
>
> Queuing is a *time adaptation* technique used for saving information until the intended message receiver is ready to receive it, be that just nanoseconds, milliseconds, or many minutes away. Entities are indirectly communicating, and each is operating at its own preferred or maximum speed unaffected by the others.

Burnie Blakeley, Harry Harris & Rhys Lewis, *Messaging & Queuing Using the MQI* 39 (1995) (emphasis in original). The same source defines "message" as "header" plus "user data." *Id.* at 377. The header consists of message attributes which help to control the delivery of the message to its destination queue, such as the target queue name, the length of user data, message priority, etc. *Id.* An authority cited by plaintiff defines the header as "[t]hat part of a message that contains the transmission-control information preceding the text." Charles J. & Roger J. Sippl, *The Computer Dictionary and Handbook* 319 (3d ed.1980).

Each potential bidder responded to the RFI, with Boole and BMC responding jointly. Only Candle stated that its product could edit the contents of messages in a queue. The other potential bidders stated that their products could not do so.

On October 21, 1997, DCEETA issued a request for proposals ("RFP") to Boole, Candle, and Tivoli for a system to manage and monitor its MQSeries system. The RFP indicated that the procurement was a "commercial item" acquisition. *See* 48 C.F.R. Part 12 (1997). Section B of the RFP contained contract line items for perpetual software licenses, maintenance for fiscal year 1998, and options for maintenance for fiscal years 1999–2001. Section M indicated that the contract would be awarded to the offer representing the best value to the government, considering cost and technical factors. However, section M also stated that "[i]n order to be considered for award, it is *necessary that the offer satisfy all* Minimum Essential Requirements." AR at 250 (emphasis in original). The next section listed the Minimum Essential Requirements ("MERs") and again emphasized that "an Offeror's/Vendor's product *MUST* meet [the MERs] in order to be considered for selection." AR at 253 (emphasis in original). MER 10 stated: "The MQSeries management system shall provide the capability to edit messages in a queue." AR at 255. MER 33 stated: "Product must be generally available (GA) and shipping as a production model (not an Alpha or Beta product) 01 June 1997." AR at 258. Proposals were due November 5, 1997. The RFP was amended twice before that date in response to questions from Candle and Boole. Neither amendment addressed MER 10 or 33.

On November 5, 1997, Boole and Candle submitted proposals. With respect to MER 10, Boole's proposal stated that a component of its product, *Command* MQ,

> provides the ability to manipulate message header information. *Command* MQ's rule processor provides users with the ability to direct a message to any queue, by changing the transmission header. Additionally, *Command* MQ provides a REXX API [application product interface] to the MQI thereby providing a facility to retrieve the message, edit it's [sic] contents and place the message in a queue.

AR at 322. Boole and the government explain that the "REXX API" requires "the agency to develop its own code or use another commercial product to interface with the API and edit the contents of messages." Intervenor's Opp'n to Pl.'s Mot. for J. on the R. ("Int. Opp.") at 8; Def.'s Mot. for J. on the R. ("Def. Mot.") at 18. Boole's proposal also

stated that its product complied with MER 33. Boole proposed a total price of $398,743.

In response to MER 10, Candle's proposal stated that *PQEdit*, a component of the offered system, "provides the capability to edit messages in a queue. This Generally Available product is available to the user right 'out of the box.'" AR at 386. Candle also stated that its product complied with MER 33 and proposed a total price substantially higher than Boole's. The price for *PQEdit* was not a significant percentage of Candle's total proposed price. AR at 660.

Also on November 5, 1997, Tivoli faxed a letter to DCEETA stating that it would not be participating in the competition. Tivoli expressed certain technical and security concerns and stated that the inclusion of MER 10 effectively excluded it from the competition because Tivoli did not have a product on the market which "provide[s] the ability to view and change messages in an MQSeries queue." AR at 279. Tivoli explained that "[o]nly one of the bidders, Candle Corporation, provides this capability. If this was Defense CEETA's intent following the RFI, perhaps a sole source acquisition would have been more appropriate." *Id.*

The five members of DCEETA's technical evaluation team reviewed each proposal. Four evaluators passed Boole with respect to MER 10, although one noted that Boole's product could "edit just [the] header." AR at 431. The fifth evaluator also noted that Boole's product "[c]an edit [h]eaders" but failed Boole on MER 10, finding that Boole's proposed use of an API for editing message contents "does not imply existing capability" and "does not imply actual functionality exists." AR at 524, 528, 532.

The technical team then met as a group. Notes from the meeting indicate the team ultimately passed Boole on MER 10, concluding that the "requirement does not explicitly state message contents were to be edited. Consensus felt that it would not be difficult to write the appropriate Rexx script to do so." AR at 573.

On November 13, 1997, DCEETA issued another amendment to the RFP and on November 19, 1997, the agency issued a list of additional concerns and questions to each offeror. Neither the amendment nor the lists addressed MER 10 or 33.

After receiving each offeror's response to the amendment and list of concerns, the technical team again evaluated the proposals. The team ultimately passed each proposal on all of the MERs and the other technical criteria in the RFP. With respect to Boole's compliance with MER 10, the group concluded that the proposed "Rexx script is adequate." AR at 904. Out of a possible 60 points, Boole's proposal was given a score of 43.7. Candle's proposal received a slightly higher technical rating of 46.6 points.

The proposals were then passed on to the cost evaluation team. Boole's proposal was given a score of 40 points out of a possible 40 while Candle's was given a score of 29.3. Thus, Boole's total score was 83.7 and Candle's was 75.9. The evaluators concluded that Candle's slight technical advantage was not worth the significantly higher price and recommended to the Source Selection Authority ("SSA") that the contract be awarded to Boole. The SSA accepted that recommendation and, on November 25, 1997, Boole was notified that its proposal had been accepted. Boole delivered the software the next day.

Also on November 25, 1997, DCEETA notified Candle of the award to Boole and offered to hold a debriefing. Pursuant to Candle's request, the debriefing was held on December 1, 1997.

On December 5, 1997, Candle protested the award to the General Accounting Office, alleging that the award was improper primarily because Boole's proposal did not comply with MERs 10 and 33. On December 12.1997, the head of DCEETA authorized continued contract performance notwithstanding the protest on the ground that continued performance was in the best interests of the United States. *See* 48 C.F.R. § 33.104(c)(2) (1997). It appears that Candle has since withdrawn the protest.

On December 17, 1997, Candle filed a complaint in this court accompanied by a motion for preliminary injunctive relief. The papers seek a preliminary and permanent injunction ordering defendant to terminate the contract

with Boole as well as a declaration that the award to Boole was contrary to law and that Candle is entitled to the contract award.

A telephonic status conference was held on December 18, 1997 regarding the need for immediate injunctive relief. As provided in an order issued on that date, counsel for plaintiff expressed concern that, absent injunctive relief, defendant would urge that contract performance was too far along to justify termination of the contract should plaintiff prevail on the merits. The court assured plaintiff that since the agency was on notice of the potential improprieties in contract award given the earlier filing of the GAO protest as well as the filing of the complaint, continued performance would not be a valid factor in determining appropriate relief, should plaintiff prevail on the merits. As a result, counsel agreed that no action on plaintiff's request for preliminary injunctive relief was necessary.

On January 22, 1998, defendant filed a motion for judgment on the administrative record (which defendant also filed on that date). Plaintiff filed a cross-motion on January 29, 1998. On December 19, 1997, Boole moved to intervene on behalf of defendant pursuant to RCFC 24 and 65(f)(3). That motion was granted by order dated January 15, 1998. Intervenor has not separately moved for judgment on the record but has filed an opposition to plaintiff's motion.

Plaintiff's position is that the award to Boole must be set aside because it was not in accordance with law. Plaintiff argues that Boole's product did not comply with MER 10 because it did not possess the capability to edit the contents of messages in a queue. Plaintiff asserts further that Boole's method of achieving this capability—requiring the government to write or purchase elsewhere the necessary software code or script—was not permitted by MER 10 or 33. Thus, plaintiff reasons, by awarding the contract to Boole, the government improperly relaxed or changed MERs 10 and 33 without notifying Candle, thereby depriving Candle of an opportunity to compete on the same basis. Plaintiff maintains that these actions amount to a violation of the government's legal duty to evaluate proposals in accordance with the criteria stated in the RFP, to treat all bidders fairly and equally, and to notify all offerors of changed requirements. Plaintiff also maintains that it was prejudiced as a result of these violations.

Defendant contends that DCEETA properly deemed Boole's proposal compliant with MER 10 because Boole's product could edit message headers, and MER 10 requires no more. Furthermore, even if MER 10 also requires the capability to edit the contents of messages, defendant argues, Boole's product satisfied this requirement because the capability could be achieved through a minor adjustment. Similarly, defendant asserts that Boole's product complied with MER 33 because all components were generally available as of June 1, 1997 and because the use of a minor modification does not render a product commercially unavailable according to the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 2.101 (1997). Defendant also claims that the change between the RFI, which inquired about the ability to edit the "contents of an individual message" in a queue, and MER 10, which required "the capability to edit messages in a queue," rendered the meaning of MER 10 patently ambiguous and imposed a duty on Candle to seek clarification before submitting a proposal. Having failed to discharge this duty, defendant concludes, plaintiff cannot now be heard to complain. Finally, defendant maintains that plaintiff cannot prove it was prejudiced as a result of the improprieties because of the significant price disparity between its proposal and Boole's.

Oral argument was held on February 10, 1998. The court has jurisdiction pursuant to 28 U.S.C.A. § 1491(b)(1) (West Supp.1997).

## DISCUSSION

Cross-motions for judgment on the administrative record under RCFC 56.1 are evaluated under the same standards as motions for summary judgment under RCFC 56(a). *Redland Genstar, Inc. v. United States,* 39 Fed.Cl. 220, 230 (1997). Each motion must be evaluated on its own merits and will be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.*

Under the standard of review applicable in bid protests, an agency's procurement decisions will not be disturbed unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); 28 U.S.C.A. § 1491(b)(4) (West Supp.1997). In addition, "[a] protester must show not simply a significant error in the procurement process, but also that the error was prejudicial, if it is to prevail in a bid protest." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir.1996). In reviewing the award process, the court must be mindful that "agencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.'" *Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958–59 (Fed.Cir.1993) (quoting *Tidewater Management Servs., Inc. v. United States*, 216 Ct.Cl. 69, 83, 573 F.2d 65, 73 (1978)).

Pursuant to Competition in Contracting Act. the government is required to specify its needs and solicit proposals "in a manner designed to achieve full and open competition for the procurement." 10 U.S.C. § 2305(a)(1)(A)(i) (1994). The fact that the procurement is a commercial item acquisition does not relieve the government of this obligation. *See National Aeronautics and Space Admin.—Recons.*, B–274748.3, 97–1 C.P.D. ¶ 159 at 4, 7. Thus, "[t]he description of agency need must contain sufficient detail for potential offerors of commercial items to know which commercial products or services may be suitable." 48 C.F.R. § 12.202(b) (1997). All evaluation factors that will affect contract award and their relative importance "shall be clearly stated" in the solicitation. 48 C.F.R. § 15.304(d).[1]

Furthermore, the agency must "evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." 48 C.F.R. §§ 15.305(a), 12.602(b)–(c) (1997); 10 U.S.C. § 2305(b)(1) (1994). "When, either before or after receipt of proposals, the Government changes its requirements or terms

and conditions, the contracting officer shall amend the solicitation." 48 C.F.R. § 15.206(a) (1997). Similarly, "[i]f a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer shall amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution proposed or any other information that is entitled to protection." 48 C.F.R. § 15.206(d) (1997). In short, offerors must be "notified of the government's changed or relaxed requirements." *Meridian Management Corp.; Consolidated Eng'g Servs., Inc.*, B–271557.2, 96–2 C.P.D. ¶ 64 at 5; *Cylink Corp.*, B–242304, 91–1 C.P.D. ¶ 384 at 4; *Rix Indus., Inc.*, B–241498, 91–1 C.P.D. ¶ 165 at 6.

The evaluation scheme established by the government in this case made clear that "[i]n order to be considered for award, it is *necessary that the offer satisfy all* Minimum Essential Requirements." AR at 250 (emphasis in original). MER 10 stated that any offered product had to "provide the capability to edit messages in a queue." AR at 255. MER 33 provided that the "[p]roduct must be generally available (GA) and shipping as a production model (not an Alpha or Beta product)" as of June 1, 1997. AR at 258. Boole's proposal indicated that its product could edit the headers of messages but that the capability to edit message contents could be achieved only if DCEETA "develop[ed] its own code or use[d] another commercial product to interface with [Boole's] API." Int. Opp. at 8; Def. Mot. at 18.

DCEETA first contends that it properly found Boole's proposal compliant with MER 10 because "the capability of the Boole product to edit the header of the message was sufficient." Def. Mot. at 14. Defendant asserts that "the language of the MER did not specify that the product must be able to edit the contents or body of the message, only the message." *Id.*

This position lacks merit. As a matter of common sense, a word is generally under-

---

1. Where, as here, commercial items are being procured through competitive negotiation, the agency is required to use the provisions of FAR part 15 in conjunction with part 12. 48 C.F.R. § 12.203 (1997).

stood to encompass the entire object it refers to, not part of it. For instance, the word "book" does not contemplate only the title but also the text. The word "letter" does not refer simply to the address but also the body of the letter. Likewise, the word "message" contemplates more than simply the header; as plainly recognized in the industry, it refers to the *whole message*. The authority cited in the record clearly states that "Message = Header + User Data." Blakeley, Harris & Lewis, *supra* at 377. Similarly, DCEETA itself defined "message contents" in the RFI to include "both header and data fields." AR at 14.

Not surprisingly, therefore, the record indicates that MER 10 was interpreted as requiring the capability to edit the *whole message*. Tivoli withdrew from the competition primarily because it understood MER 10 this way. AR at 279. Boole obviously had the same understanding or it would not have proposed the use of the API and an additional script in response to MER 10. In fact, Boole states in its filings that the script was "necessary to enable Boole's software to *edit messages in a queue*," the exact language used in MER 10. Intervenor's Counter–Statement of Facts ¶ B.2 (emphasis added).

DCEETA's evaluators also understood that MER 10 required the capability to edit message contents. One of the five evaluators initially failed Boole as to MER 10 even though its product could edit headers because its proposal did "not imply [the] existing capability" to edit message contents. AR at 528, 532. Furthermore, the team as a whole passed Boole on MER 10 based on its finding that the script enabling Boole's prod-

uct to edit message contents would not be difficult to prepare, indicating it believed this function was required. AR at 573. Given the plain language and the way MER 10 was interpreted, defendant's contrary interpretation—that MER 10 did not require the capability to edit message contents—is unreasonable.[2]

Defendant responds that even if MER 10 did require the capability to edit message contents, DCEETA properly determined that Boole's product satisfied the requirement because it needed only a "minor adjustment" to achieve this function. As support, defendant notes that a consensus of the technical evaluators "felt that it would not be difficult to write the appropriate Rexx script," AR at 573, and that the FAR defines "commercial items" to include products which require only a "minor modification" to meet government requirements. 48 C.F.R. § 2.101 (1997).

This argument must be rejected. The government was not proposing simply to "modify" Boole's product in any fashion, minor or otherwise, to achieve compliance with MER 10. Rather, the government intended to "develop its own code or use another commercial product to interface with" Boole's API. Def. Mot. at 18. This represents a significant departure from the evaluation scheme in the RFP, which made clear that a "*minimum essential requirement*" of any product offered was that it possess the capability to edit message contents (MER 10) and that it be generally available and shipping as a production model since June 1, 1997 (MER 33). The competitive impact of this deviation was also significant. Had the government amended the RFP to reflect its changed re-

---

**2.** Since MER 10 is capable of only one reasonable interpretation—that it requires the capability to edit message contents—defendant's contention that the requirement was patently ambiguous is rejected. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed. Cir.1996) ("A contract term is unambiguous when there is only one reasonable interpretation."). Furthermore, the "change" from the RFI (edit the "contents of an individual message") to the RFP ("edit messages") did not render the plain language of MER 10 ambiguous. Even if one were predetermined to read a change in meaning into the different language, the only reasonable conclusion would be that the RFP requirement is *broader* than

the RFI since the RFP uses the unmodified term "message," thereby requiring the ability to edit both the header and the user data, while the RFI requires only the ability to edit the "contents of a message," *i.e.,* the user data. Nothing about such a change would support defendant's claim that MER 10 was obviously unclear as to whether the ability to edit message contents was required. *See Triax Pac., Inc. v. West,* 130 F.3d 1469, 1474–75 (Fed.Cir.1997) (patent ambiguity doctrine is "applied only to contract ambiguities that are judged so 'patent and glaring' that it is unreasonable for a contractor to discover and inquire about them.").

quirements, it is likely that Tivoli, one of only four potential bidders identified by the government, would have participated in the competition. AR at 279. Thus, in light of the agency's duty to "achieve full and open competition," 10 U.S.C. § 2305(a)(1)(A)(i), its deviation from the solicitation requirements in evaluating Boole's proposal was not minor.

In short, by virtue of its decision to accept a product which did not possess the capability to edit message contents but required the agency to develop or procure elsewhere the necessary script, DCEETA demonstrated that it did not, in fact, require a product which, at a minimum, complied with MERs 10 and 33. As a result, its decision to award the contract to Boole was contrary to its legal obligation to "evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." 48 C.F.R. §§ 15.305(a), 12.602(b) & (c); 10 U.S.C. § 2305(b)(1). When the agency decided to relax the solicitation requirements and accept Boole's alternative approach, it was required to notify all offerors that the evaluation criteria had changed, and its failure to do so was contrary to the requirements of 48 C.F.R. § 15.206 and its fundamental statutory obligation to "achieve full and open competition for the procurement." 10 U.S.C. § 2305(a)(1)(A)(i).

■ As stated above, however, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). This requires proof that, had it not been for the statutory or regulatory violation, "there was a reasonable likelihood that the protester would have been awarded the contract." *Id.* Put differently, the protestor must establish "that there was a substantial chance it would have received the contract award but for that error." *Statistica*, 102 F.3d at 1582. If the protester's price would have remained significantly higher then the awardee's had there been no illegality, and there is no evidence that the SSA's award decision would have changed, it is unlikely the court will find prejudice. *See Alfa Laval Separation, Inc. v. United States*, 40 Fed.Cl. 215, 234–35 (1998) (fact that pro-

testor's price was 29.56% higher than awardee's "renders it impossible for the court to find prejudice"); *Analytical & Research Technology, Inc. v. United States*, 39 Fed.Cl. 34, 54 n. 19 (1997) (assuming violation of procurement laws, no prejudice where protester's price was 35% higher than awardee's); *Statistica*, 102 F.3d at 1583; *Data Gen.*, 78 F.3d at 1563–64.

■ Here, Candle's price was significantly higher than Boole's and the total price for *PQEdit*, the component providing the capability to edit message contents, was only a small fraction of the total. AR at 660. Thus, if the government had complied with its legal obligations and notified Candle that this capability was no longer a minimum essential requirement, the record indicates Candle's price still would have been considerably more expensive than Boole's. Since DCEETA did not think Candle's slight technical advantage (which may have decreased if *PQEdit* was removed from the proposal) was worth the original price differential, there is no reason to conclude its position would have changed if the differential were reduced by the small amount Candle listed for *PQEdit*. Therefore, there is no basis for concluding that Candle had a substantial chance of receiving the contract but for the illegality.

Plaintiff contends, however, that the government failed to consider significant costs associated with its development and maintenance of the REXX code and that it may not have "employed the same proposal pricing strategy had the government advised all offerors that it was dropping MER 10." Pl.'s Mot. for J. on the R. at 25. These assertions, however, are unsupported. *See Data Gen.*, 78 F.3d at 1563 (finding no prejudice in part because protester "presented no evidence—not even a company executive affidavit—that at any time it would have reduced its price to compete more effectively"); *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626–27 (Fed.Cir.1984) ("In countering a motion for summary judgment, more is required than mere assertions of counsel"). There is simply nothing in the record indicating that Candle was prejudiced as a result of the illegalities. "[A] disappointed offeror that has made a business judgment to pro-

pose an expensive product cannot utilize the protest system to obtain the proverbial second bite at the apple." *Alfa Laval,* 40 Fed. Cl. at 235 (citing *Data Gen.,* 78 F.3d at 1564).

### CONCLUSION

For the reasons stated above, it is determined that the government violated procurement statutes and regulations in awarding the contract to Boole. However, plaintiff has not presented any viable evidence upon which to conclude that it was prejudiced as a result of these violations. Therefore, there are no genuine issues of material fact, and defendant's motion for judgment on the record must be granted and plaintiff's motion denied. The Clerk is directed to enter judgment in favor of defendant and intervenor and to dismiss the complaint. No costs.