ORCA NORTHWEST REAL ESTATE
SERVICES, Plaintiff,

v.

UNITED STATES of America, Defendant,

and

Harrington, Moran, Barksdale,
Inc., Intervenor.

No. 05–228C.

United States Court of Federal Claims.

Filed:  April 18, 2005.

Reissued:  April 28, 2005.[1]

As Amended on Reconsideration
May 2, 2005.

1.  This opinion was first filed on April 18, 2005, under seal.  The parties made minor redactions, reflected here by asterisks throughout.  In addition, the court made minor editorial changes.  An unredacted version of the current opinion is being filed contemporaneously herewith.

William T. Welch, Washington, D.C., with whom was Jeffrey P. Hildebrant, for plaintiff.

Reid Prouty, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Robert E. Kirschman, Assistant Director, for defendant.

Alexander J. Brittin, McLean, Virginia, for intervenor. Jonathan D. Shaffer, Washington, D.C., of counsel.

## OPINION

BRUGGINK, Judge.

This post-award bid protest is before the court on the parties' cross-motions for judgment on the administrative record pursuant to RCFC 56.1. We have jurisdiction under 28 U.S.C. § 1491(b)(1) (2000). The dispute involves award of a contract issued by the Department of Housing and Urban Development ("HUD") for the provision of management and marketing services ("M & M") for single-family housing owned by HUD. Plaintiff, ORCA Northwest Real Estate Services ("ORCA"), challenges award of the contract to Harrington, Moran, Barksdale, Inc. ("HMBI"), the intervenor. ORCA seeks injunctive and declaratory relief. The administrative record ("AR") is complete and the motions have been fully briefed. In addition, the court took the testimony of two witnesses.[2] Oral argument was heard on April 13, 2005. For the reasons set out herein, we deny ORCA's request for relief.

## BACKGROUND

HUD, through the Federal Housing Administration ("FHA"), administers the single-family mortgage insurance program. In that capacity, HUD insures approved lenders against the risk of loss on loans for the purchase of single-family homes. In the event that an FHA-insured loan defaults, the foreclosed home is conveyed to HUD by the lender. Consequently, HUD acquires title on tens of thousands of homes a year.[3] The agency turns to contractors to manage and market the homes in its possession. The procurement at issue here was for one of the agency's many such M & M contracts.

HUD issued Request for Proposal ("RFP") Number R–OPC–22505 on August 6, 2003. Proposals were sought for the provision of:

Management and marketing services to successfully monitor mortgagee compliance with the Department's property conveyance requirements, to successfully manage single family properties owned by, or in the custody of [HUD], to successfully market those single family properties which are owned by HUD, and to successfully oversee the sales closing activity, including proper accounting for HUD's sales proceeds.

AR 3. Pursuant to the RFP, one contract was anticipated for each of twenty-four geographic areas spanning the country. These areas were grouped into four Homeownership Centers ("HOCs"). The M & M contract for the

---

2. Ms. Brenda Thomas, the Contracting Officer, and * * *, the Technical Evaluation Panel chairperson.

3. Due to the FHA insured loan program, HUD is the largest real estate seller in the country. The agency sold 63,000 single-family homes in fiscal year 2002. AR 15.

third geographic area of the Santa Ana HOC ("SA–3") is at issue here.[4]

The SA–3 procurement was offered as a Small Business Set Aside. According to the RFP, the award decision would adhere to a cascading procedure: The competition would only open to offerors of all sizes if HUD determined that competition between small businesses was not adequate. If awarded as a small business set aside, the contract would include a clause mandating that the contractor's employees would account for at least 50% of the work performed under the contract.

The RFP required offerors to submit proposals in two parts: a Technical and Management Proposal ("technical proposal") and a Business Proposal, which concerned pricing. Offerors were notified that, because they were bidding on a "best value" procurement, a proposal's technical aspects were "significantly more important" than pricing. AR 255. Technical proposals were evaluated in light of six factors. In descending order of importance, these were: (1) Management Capability and Quality of Proposed Management Plan; (2) Past Performance; (3) Prior Experience; (4) Proposed Key Personnel; (5) Subcontract Management; and (6) Small Business Subcontracting Participation. AR 256–58.

In the fall of 2003, six small business offerors, including ORCA and HMBI, submitted proposals for the SA–3 contract. The offerors' technical proposals were initially reviewed by a Technical Evaluation Team ("TET"), a group of HUD officials convened to evaluate the technical aspects of the Santa Ana HOC proposals. The TET rated * * *'s technical proposal "Excellent." ORCA and HMBI both received a "Good" rating, while the remaining three proposals were rated "Fair" or "Poor." Although HMBI received the same technical rating as ORCA, the TET concluded that HMBI's technical proposal presented a greater risk of unsuccessful performance. The TET recommended that only the proposals of * * * and ORCA receive further consideration.

The TET's recommendations were made to the Technical Evaluation Panel ("TEP"). The TEP, which counts among its members the chairs of each TET, evaluated both the technical and pricing components of each proposal submitted in response to the RFP nationwide. With regard to the SA–3 contract, the TEP considered the TET report but decided to include HMBI in the competitive range along with * * * and ORCA. The TEP concluded that the TET had placed improper emphasis on HMBI's lack of familiarity with the SA–3 geographic area.

In February 2004, Ms. Brenda Thomas, the Contracting Officer ("CO"), initiated discussions with the three offerors in the competitive range. In a round of discussion letters tailored to each, Ms. Thomas outlined the shortcomings perceived by the TEP in the technical and business proposals. Within a few weeks, each competitor submitted proposal revisions in response to the concerns communicated by Ms. Thomas. A second round of discussion letters was transmitted to the competitors in April 2004. Final proposal revisions were submitted shortly thereafter.

The TEP reconvened to examine the final proposal revisions. In the Final Technical Evaluation Report, ORCA's technical rating was elevated from "Good" to "Excellent." Technical ratings for the other two competitors were unchanged. HMBI's proposal presented the lowest evaluated cost at $83,408,515. ORCA's cost was projected to be * * *; * * *'s was projected to be * * *. Despite the greater weight accorded a proposal's technical characteristics, the TEP concluded that the technical superiority of the * * * and ORCA bids was not great enough to justify their cost premium relative to HMBI's proposal. Therefore, the TEP recommended HMBI for award as the best value to the government.

The Source Selection Official was * * *, * * *. His final decision reflected the TEP's evaluation and recommendation. On June 7, 2004, * * * selected HMBI for the SA–3 contract award. On June 26, 2004, Contract No. C–DEN–01912 was signed by Ms. Thomas and Mr. Maurice Barksdale, HMBI's pres-

---

4. SA–3 encompasses Alaska, Idaho, Oregon, and Washington.

ident. The one-year contract, which became effective August 1, 2004, included four one-year options to be exercised at HUD's discretion. HUD also awarded HMBI three other M & M contracts under the RFP.[5] The total estimated value of the four contracts, if option years are exercised, is in the hundreds of million dollars.

ORCA filed an untimely agency level protest of the SA–3 award August 29, 2004. After the denial of its protest, ORCA filed a post-award bid protest complaint with this court on September 21, 2004. That action was assigned to Judge Lettow. HMBI intervened. Following discussions between the parties to the protest, a Joint Stipulation of Dismissal was entered on October 21, 2004. Pursuant to that stipulation, HUD agreed to "reevaluate the proposals of the protester and awardee in this solicitation" and to suspend further transfer of SA–3 properties to HMBI pending the reevaluation's outcome. * * * was not involved in the protest and was not included in the reevaluation procedure.

One of the numerous issues ORCA raised in its initial protest before this court was HUD's treatment of HMBI as a "responsible" bidder despite sparse supporting evidence. For example, ORCA pointed to HMBI's less than stellar financial history as proof that the awardee couldn't meet the responsibility standards of the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 9.104–1 (2004). By 5:02 p.m. on October 21, the day of dismissal, HMBI began to furnish HUD with new information relevant to its responsibility in general and its financial situation in particular. It submitted evidence that it had met the bonding requirements of its four M & M contracts by securing a * * * letter of credit that very day. Four days later, HMBI faxed HUD evidence that the Small Business Administration ("SBA") had approved a Mentor/Protégé Agreement ("MPA") between HMBI and BTS, Inc., a substantially larger corporation that HMBI proposed using as a subcontractor.

On December 22, 2004, HUD requested HMBI to submit additional financial information to support the agency's evaluation of HMBI's financial resources and performance capability. The agency contends that its request was mandated by FAR § 9.105–1(b)(3), which states that "[i]nformation on financial resources and performance capability shall be obtained or updated on as current a basis as is feasible up to the date of award." ORCA received a similar request on January 31, 2005.

HMBI responded to HUD's request with evidence that it had hired a staff justifying a * * * monthly payroll, had secured * * * in financing, and was able to count * * * in accounts receivable from other HUD contracts. These significant improvements to HMBI's financial position arose after the June 2004 award and are attributable to its receipt of other M & M contract awards during the summer of 2004.

The TEP understood that it was to reevaluate ORCA's and HMBI's technical proposals as they stood at the time of the June 2004 award. The TEP did not ask either bidder to submit new technical information, nor did it initiate any discussions directly with either bidder.[6] Upon reevaluation in its Revised Final Report, the TEP lowered the overall technical rating for ORCA's proposal from "Excellent" to "Good." It assigned ORCA the same rating in all but one of the technical categories. As to Factor 1 (Management Capability and Quality of Proposed Management Plan), the technical evaluation factor of greatest weight, the TEP lowered ORCA's score from "Excellent" to "Good." Within that factor, three weaknesses and two significant weaknesses were identified. In the final analysis, the TEP rated both HMBI's and ORCA's technical proposals "Good," although the panel concluded that ORCA's proposal retained marginal superiority.

In its review, the TEP also discovered an error in its previous evaluation of ORCA's business proposal. The error's correction

---

5. HMBI was awarded M & M contracts for Atlanta HOC Areas 1 and 2 and Philadelphia HOC Area 6. These contracts were awarded in June and July 2004.

6. * * *, the TEP chairperson, testified. We believe his testimony in this regard.

elevated the evaluated cost of ORCA's proposal from * * * to * * *. ORCA does not question this calculation. HMBI's cost evaluation was unchanged. Consequently, the proposals' cost differential rose from approximately * * *% to * * *%. In light of the greater cost differential and the reduction of ORCA's technical rating, * * * again concluded that HMBI's proposal offered the government a better value than ORCA's proposal.

Five days after this second source selection determination, Ms. Thomas conducted a revision of her initial determination of HMBI's responsibility.[7] Ms. Thomas concluded, based in no small part on the new information provided by HMBI, that HMBI was a responsible bidder and that the SA–3 contract award warranted "reinstatement." At no point had the June 2004 award been cancelled, and HMBI had continued performance of the original award, albeit at a substantially reduced level.[8]

## DISCUSSION

ORCA challenges a number of aspects of the procurement. We may set the contract aside, however, only if HUD's award decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. This standard is drawn from section 706 of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A) (2000); see 28 U.S.C. § 1491(b)(4); *PGBA, LLC v. United States,* 389 F.3d 1219, 1228 (Fed.Cir.2004); *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed.Cir.1998). Procurement shortcomings of either a substantive or procedural nature may constitute grounds for granting ORCA's protest. *Impresa Con-*

*struzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001).

In order to demonstrate that one of the agency's substantive procurement determinations violated the APA standard, ORCA must overcome the presumption that "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Id.* (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994)). Accordingly, a " 'disappointed bidder bears a "heavy burden" of showing that the award decision "had no rational basis." ' " *Id.* at 1333 (quoting *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994) (citation omitted)).

In addition, the challenge will only be sustained, even in the event of a procedural violation, if the violation was prejudicial to the protestor. *See Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1330 (Fed. Cir.2004). While a protester need not prove that, but for the alleged error, it would have been awarded a particular contract, *Data Gen. Corp. v. Gen. Servs. Admin.,* 78 F.3d 1556, 1562 (Fed.Cir.1996), it must nevertheless show that it would have had a "substantial chance" at success. *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004); *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001); *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999); *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996) (protester must show "that there was a substantial chance it would have received the contract award but for that error.").[9]

7. There is no evidence in the record that Ms. Thomas recorded her initial responsibility determination for the June 2004 award. At the hearing, the government claimed that its absence from the administrative record was an oversight. The issue of its existence has no bearing on our decision here.

8. At the time of the initial protest, Ms. Thomas notified HMBI that it was only to perform contract duties with regard to those houses transferred to the contractor prior to the protest. The transfer of additional properties was halted. The incumbent on the previous contract retained control of remaining properties.

9. Our finding below that ORCA has not shown prejudice does not mean we accept HMBI's argument that ORCA lacked standing to bring this action. We view the threshold question of standing, which involves an allegation of potential prejudice, as satisfied here by the undeniable fact that, at least insofar as this reevaluation is concerned, there were only two bidders in contention, and the agency was committed to reevaluating both of their proposals. *See Galen Med.,* 369 F.3d at 1331. This minimal prejudice for standing is not inconsistent with our analysis on the merits. Some of ORCA's allegations, if adopted by the court, would have constituted such a comprehensive series of violations that the absence of

At the outset, we acknowledge the many particularized challenges ORCA levels at the substance of HUD's technical evaluations. In light of the voluntary dismissal of ORCA's initial protest and the discretionary nature of the agency actions at issue, however, we decline to consider these challenges in any detail.[10] Therefore, we limit our review, in sum, to the following three matters of concern: HMBI's asserted inability to meet responsibility requirements; HUD's error in permitting HMBI to amend its technical proposal prior to the second reevaluation; and the erroneous procedure associated with the downgrade of ORCA's technical proposal during reevaluation.

### A. The responsibility determination

FAR § 9.104–1 requires a CO to assess the responsibility of a putative awardee prior to award. The determination is independent of the award decision itself, although it may well be related to both technical and pricing aspects of the proposal. The responsibility assessment entails such matters as whether an offeror has "adequate financial resources," can comply with the proposed performance schedule, has a satisfactory performance record, has the necessary "organization, experience, and technical skills" to perform the contract, and has the facilities necessary to perform. FAR § 9.104–1. During the first protest, ORCA argued HMBI's lack of financial and human resources demonstrated that HUD's determination of HMBI's responsibility was arbitrary, capricious, and an abuse of discretion. ORCA highlighted HMBI's failure to produce meaningful evidence of either bonding capacity or adequate start-up resources. The record before the agency as to HMBI's financial wherewithal in June 2004 was, indeed, thin.[11]

ORCA's challenge to the responsibility determination is directed primarily at a state of affairs that existed in June 2004 and not to

prejudice would have been far less certain. In that case, the appropriate remedy may have been to set the award aside and open the procurement to entirely new submissions.

10. ORCA went to great lengths in its briefing to fault the agency's technical evaluation of both ORCA and HMBI. According to ORCA, HUD improperly ignored the following evidence (or the lack thereof) relevant to HMBI's technical abilities: a weak financial position prior to the June 2004 award; an over-reliance on subcontractor Best Assets; an over-reliance on future hires; an insignificant past performance record; an inability to prove future bonding capacity; and a failure to demonstrate the ability to meet start-up costs. ORCA also challenges the substance of a number of shortcomings in its own proposal that the agency identified during the reevaluation.

Despite ORCA's best efforts, we cannot sustain the protest on grounds that HUD lacked a rational basis for the substantive conclusions it reached during the evaluation and reevaluation of both technical proposals. First, with regard to those arguments concerning HUD's initial evaluation, we believe ORCA's decision to forego its initial bid protest in favor of an agency re-reevaluation constituted a waiver. Second, with regard to the entire body ORCA's technical arguments in general, we decline the invitation to plumb the depths of HUD's discretion. Although ORCA presents many factual explanations, clarifications, and restatements in an effort to prove the erroneous nature of HUD's evaluative conclusions, there has been no showing that these conclusions lacked a rational basis. Virtually every determination made by a HUD body or official

was documented and explained in depth. Even those shortcomings attributed to ORCA's proposal for the first time during reevaluation were buttressed with an explanation of the TEP's rationale. Cf. U. Int'l Investigative Servs., Inc. v. United States, 41 Fed.Cl. 312, 321 (1998) (agency official's reevaluation faulted for reducing the score of an unrevised proposal without explanation). In the absence of a compelling showing by ORCA, this court is neither equipped nor empowered to look beyond the rationale contained in the record. Although particular complaints may have some merit, there is insufficient evidence to conclude that HUD abused its discretion.

11. The government and HMBI persist in arguing that all bonding questions are improper on the ground that they relate to performance, citing Chapman Law Firm v. United States, 63 Fed.Cl. 519, 525–26 (2005) (involving related procurement). This is an over-reading of Chapman. Whether HMBI has satisfied the contract's bonding requirement would, indeed, be a post-award issue. Some of the alleged shortcomings, however, relate to whether HMBI adequately responded to HUD's inquiry concerning future bonding capability. It is far from clear that the sketchy information offered by HMBI should have satisfied the agency. Similarly, there was very little meaningful presentation with respect to HMBI's ability to meet start-up costs. Regardless, in light of our holding below that these issues are only relevant with respect to the CO's February 2005 determination of responsibility, it was not erroneous for the agency to consider HMBI's ability to meet these requirements in light of additional developments.

HMBI's responsibility characteristics in February 2005, at the time of the reinstatement. This brings up a threshold issue with respect to what the court may properly consider in testing ORCA's complaint. Most, although certainly not all, of ORCA's current challenges to the award were also raised in the first bid protest, including issues related to responsibility. That protest was dismissed on the stipulation that the agency would reevaluate only ORCA's and HMBI's proposals. Although the ground rules for the reevaluation were not clearly spelled out, the three parties to the current protest agree that the assumption behind the stipulated dismissal was that the proposals would be given new consideration *as they existed at the time of the June 2004 award.* Even HMBI concedes that it was not contemplated that the proposals would be altered prior to reevaluation. This assumption sets up one of ORCA's current complaints: the agency accepted new information regarding technical aspects of HMBI's proposal but did not give ORCA a similar opportunity.

There was no such mutual assumption with respect to the responsibility determination, however. The legal question posed by the unique facts here is whether HMBI's responsibility shortcomings at the time of the June 2004 award, if any, are now moot in light of the first protest's dismissal and ORCA's agreement to a reevaluation of technical proposals. The applicable regulation, FAR § 9.105–2(a), provides that "[i]nformation on financial resources and performance capability [relevant to a CO's responsibility determination] shall be obtained or updated on as current a basis as is feasible up to the date of award." The government and HMBI argue that the date of the contract's reinstatement in February 2005 constitutes a second award and thereby controls the application of FAR § 9.105–2(a). ORCA's position is not entirely clear in this respect. Its briefing is plainly a broadside attack on the agency's determination in June 2004 with respect to HMBI's fulfillment of the responsibility requirements. During oral argument, however, counsel for ORCA narrowed the criticism of the agency's

handling of new responsibility information to information reflecting HMBI's receipt of the contract in dispute. In other words, even ORCA concedes, as it must, that, if the reevaluation is treated as a new award decision, it was appropriate for the agency to consider up-to-date financial information from both parties.

Ms. Thomas made it clear in her testimony that there has been only one award to HMBI—the June 26, 2004, award. The February 2005 decision to reinstate the award does not alter this fact. As she explained, the current contract with HMBI runs from August 1, 2004, the June 2004 award's effective date. Thus, on its face, Ms. Thomas' consideration of new responsibility information post-award conflicts with FAR § 9.103(b).

▇▇▇ ORCA agreed to a reevaluation, however, on the understanding and with the hope that HUD might lower its assessment of HMBI's proposal and give ORCA the award. If that occurred, it would have been necessary to terminate the old contract and award a new contract to ORCA. Indeed, ORCA was asked to update its own responsibility information during the reevaluation process and did so without objection. Under these circumstances, we believe that ORCA has waived any *objection to the agency's* receipt of similar information from HMBI.[12] This is a bid protest, and relief is equitable in nature. In our view, the fact that ORCA agreed to the dismissal of its first bid protest and the substantive reevaluation of both proposals places beyond reach any issues of HMBI responsibility at the time of the 2004 award. Moreover, ORCA participated without objection in the process of submitting new responsibility information to the CO. Ultimately we agree with the government that the process in which ORCA agreed to participate was, at least insofar as ORCA can now argue, *tantamount to a new award decision.* If ORCA wished to maintain a challenge to the earlier decision, it should not have agreed to dismissal and reevaluation.

---

12. At oral argument, counsel for ORCA made it clear that it was not objecting to the post-award receipt of *all* updated financial information, only new information related to HMBI's performance of the disputed contract.

The importance of this fact is that the agency was permitted, indeed obligated, to keep current information as to a potential awardee's responsibility. FAR §§ 9.103(b), 9.105–1(a). For example, an offeror's ability to meet the contract's bonding requirements was a relevant element of the responsibility determinations made by HUD under this procurement. *See* AR 120, 1736; *see also* FAR §§ 9.104–1(a); 9.104–3(a). Up to the date of award, then, new information could legitimately be obtained. And it was obtained from both plaintiff and intervenor here. Whatever shortcomings HMBI may have had at the time of the initial award, they were cured by the time of the reevaluation decision.[13] HMBI's finances were dramatically altered by 2005 because of its receipt in the interim of other contracts. Given the CO's conclusion that HMBI was responsible in June 2004, it is inconceivable that it would not have been found responsible in February 2005, even without the prospect of future income on this contract. The other HUD contracts totally transformed the company's balance sheet. This addresses, in our view, ORCA's argument that a responsibility determination premised on new information was a prejudicial procedural error.

*B.  HUD's failure to discuss with ORCA a new significant weakness in its proposal*

During reevaluation, neither ORCA nor HUD sought to discuss ORCA's unrevised technical proposal. An updated financial statement was the only new information that ORCA provided HUD during the reevaluation period. The eventual reduction of its Factor 1 rating (and consequently the reduction of the proposal's overall score) from "Excellent" to "Good" was largely based on the identification of a significant weakness with respect to the proposal's * * *. This same element had been identified as a strength in the final TEP report prior to the June 2004 award.[14] ORCA therefore argues that it was entitled to a discussion concerning

this new shortcoming before the source selection decision was made.

In the context of a negotiated procurement, FAR § 15.306(d) gives agencies the authority to discuss with offerors weaknesses of those proposals lying within a "competitive range" of the "most highly rated proposals." In the course of discussion, offerors can revise their proposals in response to agency-identified weaknesses. This dialogue ensures the government will obtain the "best value" from a procurement. *Dynacs Eng'g Co., Inc. v. United States,* 48 Fed.Cl. 124, 130 (2000); FAR § 15.306(d)(2).

In certain circumstances, FAR § 15.306(d)(3) requires a CO to initiate discussions with an offeror:

> At a minimum, the contracting officer must ... indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

A "significant weakness" is "a flaw that appreciably increases the risk of unsuccessful contract performance"; "deficiency" is defined as the "material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." FAR § 15.001. Although the TEP identified three weaknesses and two significant weaknesses in the reevaluation, only the significant weaknesses could have triggered the

---

13.  We agree with ORCA that it would be improper to give any weight to the fact that ORCA was a putative awardee on the contract at issue, unless it had resulted in actual payments for past services. If that resulted in accretions to HMBI's bank accounts, however, we would not expect the CO to attempt to distinguish that fact.

14.  The * * *, in addition to the previously identified * * *, brought ORCA's total number of Factor 1 significant weaknesses to two.

discussion requirement. *See* FAR § 15.306(d)(3). Moreover, with respect to a significant weakness attributed to plaintiff's * * *, we find that ORCA received and exercised an opportunity to engage HUD in meaningful discussion prior to the June 2004 award. The agency was not obligated to initiate discussions on the matter a second time during reevaluation. The only issue that remains, therefore, is whether HUD, during the reevaluation process, was required to initiate discussions with ORCA with respect to a significant weakness attributed to its * * *.

■ It is well-settled that agency-offeror discussions must be meaningful. *See, e.g., Advanced Data Concepts v. United States*, 43 Fed.Cl. 410, 422 (1999); *Biospherics, Inc.*, 2000 Comp. Gen. ¶ 118 (2000). To initiate meaningful discussions, "an agency is required to point out weaknesses or deficiencies in a proposal as specifically as practical considerations permit so that the agency leads the offeror into areas of its proposal which require amplification or correction." *Prof'l Servs. Group, Inc.*, 97–1 Comp. Gen. ¶ 54 (1996). "Discussions cannot be meaningful if an offeror is not advised of the weaknesses, deficiencies, or excesses that must be addressed in order for the offeror to be in line for the award." *CitiWest Props., Inc.*, 98–1 Comp. Gen. ¶ 3 (1997). An agency, however, need not identify "each and every item that could be raised as to improve [a] proposal," *KBM Group, Inc.*, 99–1 Comp. Gen. ¶ 118 (1999)—just "those areas of weakness which could have a competitive impact." *Bionetics Corp.*, 99–1 Comp. Gen. ¶ 7 (1998). Nor is an agency obligated to continually discuss a proposal's shortcoming until the offeror hits on the revision that responds to the agency's concerns—initial notice is sufficient. *See, e.g., USFilter Operating Servs., Inc.*, 2004 Comp. Gen. ¶ 64 (2004); *Mech. Equip. Co, Inc.*, 2004 Comp. Gen. ¶ 192 (2003). The substance of the requirement is that the protestor should be given at least one meaningful opportunity to respond to significant weaknesses.

■ The Revised Final TEP Report states that ORCA's "proposal demonstrates a limited understanding of the * * *." This is not,

however, the first instance in which the agency took issue with ORCA's plan * * *. In its First Round Discussion Letter, HUD put ORCA on notice that its "limited understanding of the * * * " constituted a significant weakness. ORCA created a "detailed * * * " in response to HUD's initial criticism. AR 2475. Upon reviewing the new plan, the TEP identified it as a strength of the revised proposal. It cited many of the plan's components and mentioned no shortcomings. Upon reviewing the same * * * just eight months later, however, the TEP returned to its original conclusion: The * * * was a significant weakness that "demonstrate[d ORCA's] limited understanding of the * * *." AR 2479. In support of this conclusion, the TEP listed five * * * that were not addressed by ORCA's plan.

The government claims the significant weakness re-designation was permissible because HUD's First Round Discussion Letter raised a red flag for ORCA concerning its approach to * * *. In support, the government points to *Professional Performance Development Group, Inc.*, where the Department of the Army "was not required to advise [the protestor] of continuing concerns during successive rounds of discussions" because first-round discussions had notified the protestor of those concerns. 99–2 Comp. Gen. ¶ 29 (1998). Similarly, the government cites *OMV Medical, Inc.*, in which it was held that the protestor was not entitled to additional discussion of a deficiency when its attempted revision was deemed inadequate by the Department of the Navy. 99–1 Comp. Gen. ¶ 38 (1999).

In his testimony, * * *, the TEP's chairperson, explained that the assessment of ORCA's plan varied so widely between the two TEP reports because the relevant criteria had evolved between June 2004 and February 2005 in response to the TEP's continued evaluation of dozens of M & M proposals. By the time of its reevaluation report, in other words, the TEP felt that a sufficient * * * should contain a number of procedures that the TEP had not contemplated at the time of the June 2004 award.

This was plainly unfair to ORCA. While the initiation of a significant weakness dis-

cussion need not encompass every detail in need of improvement, an overly general or imprecise discussion question threatens to provide no notice at all. *TechniArts Eng'g,* 89–1 Comp. Gen. ¶ 531 (1989). Although ORCA was flagged during the first round of discussions for having a "limited understanding of * * *," AR 922, it never received notice of the absent proposal elements for which it was eventually faulted. The necessity of these elements was not even recognized by the TEP at the time of the June 2004 award. Meaningful discussion involves more than an exercise in word association. The one-time characterization of ORCA's plan as a strength indicates that the application of new standards during reevaluation fundamentally altered the nature of the * * * evaluation and created a new significant weakness in ORCA's plan. HUD should have given ORCA the opportunity to eliminate this significant weakness.[15] Whether the agency's failure rises to the level of prejudicial error will be discussed below.

*C. Discussions between the agency and HMBI during reevaluation*

It is clear that some of the same responsibility information submitted by HMBI to the CO during the reevaluation period appeared in the TEP's reevaluation analysis of the technical proposal. The most glaring example concerns the SBA's approval of HMBI's MPA with Best Assets.[16] This was relevant to the responsibility determination, but it also found its way before the TEP, which considered it relevant to three technical evaluation factors.[17] The TEP explicitly states that the agreement's introduction during reevaluation "modified" HMBI's response to a discussion question concerning the proposal's staffing plan. AR 2512. Furthermore, * * * testified that the TEP felt compelled to consider the new agreement's impact in order to produce the most accurate evaluation possible.

Other pieces of new information also received positive notice in the TEP's reevaluation report. The TEP highlighted the hiring of Mr. Remi Geahel, a seasoned housing-industry executive with experience managing HUD M & M contracts. According to the TEP, Mr. Geahel was hired as a consultant to aid HMBI's "general management of the contract during the start up phases." AR 2514. Information provided to the CO by HMBI during the reevaluation also demonstrated for the first time that the human resources director was highly qualified, clarified HMBI's relationship with a subcontractor, provided additional resumes for key staff, and elucidated the employee-training plan.

15. The TEP faulted ORCA for three other weaknesses. ORCA had received notice of weakness in all three areas during the first round of discussion, however. Although revisions led the TEP, prior to the initial award, to elevate two of these weaknesses to strengths, upon reevaluation they again were considered weaknesses. Unlike the * * * 's evaluation, there is no indication that the change in assessment is attributable to an alteration of the TEP's evaluation criteria. Indeed, the very process of reevaluation contemplated such possible differences in result. The third weakness that did not appear in the TEP report until reevaluation was faulted in the TEP's earlier report. An oversight resulted in its omission from the initial weakness list.

16. The record is confused with regard to the MPA. Best Assets was a subsidiary of BTS Team, Inc. Another subsidiary was Beststaff Technical Services, Inc. The SBA approved an MPA between HMBI and BTS Team on September 3, 2004, notwithstanding the fact that the only contract between HMBI and BTS Team contained in the record was dated January 6, 2005. The apparent subject of the SBA approval was an MPA between HMBI and Beststaff that pre-dated the other contract by more than eight months. Regardless, HMBI and the members of the Beststaff/Best Assets/BTS Team corporate family were under the impression that HMBI had entered into an MPA with at least one of the subsidiaries. In light of the brief bid protest timeframe, we assume that the SBA approval applied to a valid MPA between HMBI and its actual subcontractor.

17. HMBI argued at the hearing that the positive impact of the SBA-approved MPA was effectively negated by the fact that HMBI began performance of three additional M & M contracts in the time since the June 2004 award. During the reevaluation, the TEP considered it a risk that, in the event HMBI could not perform under the subject contract, it would likely fail to perform under the other three as well, thereby leaving nearly 20% of HUD's geographic areas at risk. While HMBI raises a valid point, it is not responsive to the instances in its reevaluation report in which the TEP favorably cites the MPA in various contexts unrelated to the increased risk posed by HMBI's four M & M contracts.

Ms. Thomas testified at the evidentiary hearing that she made a point of not passing any of this new information on to the TEP. * * * testified that he had no discussions with HMBI during the reevaluation period. He offered no real explanation for how the information, which was, in places, quite detailed, made its way in front of the TEP, other than to acknowledge that he was aware of HMBI's activities in connection with other M & M contracts at the time. He assumes that his general knowledge of the MPA and HMBI's staffing of the other three contracts was imported into the reevaluation.

■ An agency may not hold discussions with one offeror without extending a similar opportunity to all other offeror's within the competitive range—to do otherwise would deprive offerors of their entitlement to meaningful discussion. *Int'l Resources Group*, 2001 Comp. Gen. ¶ 35; *CitiWest*, 98–1 Comp. Gen. ¶ 3. Whether an agency afforded an offeror the opportunity to revise or modify its proposal is the acid test for determining whether discussions have been held. *See, e.g., Consol. Eng'g Servs., Inc. v. United States*, 2005 U.S. Claims LEXIS 100, *29 (Feb. 14, 2005); *Labat–Anderson, Inc. v. United States*, 42 Fed.Cl. 806, 835 (1999). Communications with an offeror that create an inadvertent revision opportunity are no different than revisions expressly solicited by the agency. *See Dubinsky v. United States*, 43 Fed.Cl. 243. 261–62 (1999) (finding that offeror was given revision opportunity despite agency's characterization of the communications as "clarifications" rather than "discussions"); *see also EG & G Wash. Analytical Servs. Ctr., Inc.*, 91–1 Comp. Gen. ¶ 349 (1991).

■ The government and HMBI contend that the TEP's consideration of new information was not tantamount to new discussions because the TEP did not solicit the information from either the CO or HMBI. We view the origin of the information as irrelevant. Irrespective of how this new information found its way before the TEP, it amounted to a proposal revision. The agency plainly treated it as such. Government personnel involved in an acquisition "shall not engage in conduct that favors one offeror over anoth-

er." *Dynacs*, 48 Fed.Cl. at 131; FAR § 15.306(e)(1). The TEP should have realized that it could not, under the ground rules of the reevaluation, consider these new developments while reevaluating the proposal. The CO should have recognized the risk and warned the TEP. The potential for prejudice should have been apparent, moreover, when the CO read the TEP's reevaluation. At that point she still had the opportunity to ask a different team to consider the proposals.

The violation of FAR § 15.306(e)(1) is clear. ORCA still must demonstrate, however, that the violation was prejudicial.

*D.   Has ORCA demonstrated that the procedural violations were prejudicial?*

■ To recap, HUD committed two procedural errors during the reevaluation: ORCA was denied an opportunity to revise its * * * in the face of evolving HUD standards and the agency permitted a revision to HMBI's technical proposal. These errors, while significant, only entitle ORCA to relief if they were prejudicial. To show prejudice, ORCA must demonstrate that, but for the error, it would have had a substantial chance to win the award.

As discussed above, the contract at issue arose from a best value procurement in which technical evaluation factors were given "significantly more importan[ce] than price." AR 255. At the time of the June 2004 award, ORCA's proposal had an evaluated cost of * * * and an "Excellent" technical rating. HMBI's proposal, which was only rated "Good," had an evaluated price of $83,408,615. Despite ORCA's higher rating, the agency concluded that HMBI's cheaper proposal was a better value. In fact, however, as ORCA concedes, its initial proposal was mis-priced. The correct value of its bid was * * *. The difference between the two bids therefore was actually * * *, making ORCA's bid approximately * * *% higher.

As explained in *Alfa Laval Separation, Inc. v. United States*, a significant price differential "is not solely dispositive; we must consider all the surrounding circumstances in determining whether there was a substantial chance that a protester would have received an award but for a significant error in the

12

procurement process." 175 F.3d 1365, 1369 (Fed.Cir.1999). We may nevertheless take this price differential into account in determining whether ORCA has shown prejudice. We also recognize that the agency has wide discretion in weighing the various technical and price differences in a best value procurement and that a substantial rating gap (between HMBI's "Good" and ORCA's "Excellent" proposals) was insufficient in June 2004 for ORCA to overcome the perceived * * * million price differential.

Judge Merow's decision in *Candle Corp. v. United States* is instructive. 40 Fed.Cl. 658 (1998). There, the court concluded that the agency had materially altered the requirements of the solicitation without notifying the protestor. Nevertheless, the court reasoned:

> Here, Candle's price was significantly higher than Boole's and the total price for PQEdit, the component providing the capability to edit message contents, was only a small fraction of the total. AR at 660. Thus, if the government had complied with its legal obligations and notified Candle that this capability was no longer a minimum essential requirement, the record indicates Candle's price still would have been considerably more expensive than Boole's. Since DCEETA did not think Candle's slight technical advantage (which may have decreased if PQEdit was removed from the proposal) was worth the original price differential, there is no reason to conclude its position would have changed if the differential were reduced by the small amount Candle listed for PQEdit. Therefore, there is no basis for concluding that Candle had a substantial chance of receiving the contract but for the illegality.

*Id.* at 665.

For similar reasons we conclude that it is significantly more likely than not that the two errors made no difference in the outcome. There were only two offerors being considered under the terms of the stipulated dismissal. If there were more than two offerors or if the offerors were closer in price, sending this procurement back to the agency might be a worthwhile exercise. Neither situation applies here, however.

We are unwilling to put ourselves in the shoes of the TEP. Nothing in the agency's substantive evaluation rises to the level of arbitrary or capricious conduct. In the absence of the improvement to HMBI's proposal by virtue of the MPA, the most that we can assume in ORCA's favor is that HMBI once again would have been rated "Good." Likewise, in the absence of the agency's error in failing to permit ORCA to correct its * * * we can assume that ORCA's overall rating would not have dropped. It would have remained "Excellent," contrasted to HMBI's "Good." Under identical comparisons and with only a * * * million price differential, the agency chose, within its discretion, to view HMBI's proposal as the better value. We have to ask whether setting aside the contract award and seeking another reevaluation is warranted considering that, even if we assume the agency were to return to its initial technical scoring, the cost of ORCA's proposal now exceeds its competitor's by more than * * * million. We conclude that award reversal would be pointless. The other errors alleged by ORCA also do not warrant relief.[18]

## CONCLUSION

There were material defects in the agency's decision to reinstate the award to HMBI. We conclude, however, that these defects ultimately did not affect the outcome. ORCA is therefore not entitled to injunctive or declaratory relief. The Clerk is directed

---

18. ORCA contends, for example, that HUD should have referred to the SBA any continuing concerns about HMBI's over-reliance on subcontractors. *See* FAR § 19.602–1(a). HMBI made the assertion that it would comply with the solicitation's limitations on the amount of work done by subcontractors. Given the deference to which CO's determination of responsibility is due, the matter is typically left for enforcement during contract performance. *See Chapman*, 63 Fed.Cl. at 525. While the agency plainly had reservations about HMBI's relationship with Best Assets (or BTS, Inc., its alter ego), we agree with the government that the decision not to refer the matter to the SBA was not an abuse of discretion. The specific concern that HMBI would be at risk if Best Assets elected not to assist HMBI was resolved by the time of the reevaluation when the SBA, on September 3, 2004, certified the MPA between the two entities.

to dismiss the complaint. Each party to bear its own costs.